UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ICONICS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 11-11526-DPW |
| | ) | |
| SIMONE MASSARO, | ) | |
| CHRISTOPHER VOLPE, VENTO | ) | |
| INDUSTRIES, INC., BAXENERGY GmbH | ) | |
| And BAXENERGY ITALIA S.r.L., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER
June 27, 2016

## I. FACTUAL BACKGROUND

This case involves two sets of business disputes, tied together by a common cast of characters and allegations concerning misappropriation of plaintiff's intellectual property.

Plaintiff ICONICS is a software company which produces HMI/SCADA (Human Machine Interface/Supervisory Control and Data Acquisition) systems. HMI/SCADA systems collect data from a machine and transmit that data in a useful, visualized form to client computers. For example, a SCADA system might be connected to a boiler in a factory, allowing a factory operator to see and control data such as water levels or temperature.

1

This process necessarily requires customization – by either ICONICS itself or by middlemen known as "system integrators" – to the particular machines being monitored and controlled. Certain aspects of SCADA systems are standardized under the "OPC" interoperability standard.  ICONICS's software includes the GENESIS32, GENESIS64, and BizViz products.

Defendant Simone Massaro is a former ICONICS employee. Beginning in late 2007, while still employed by ICONICS, Massaro started helping another former ICONICS employee, Chris Volpe, with software development for Volpe's company, Volpe Industries. The remaining defendants, BaxEnergy GmbH, BaxEnergy Italia, S.r.L., and Vento Industries, Inc. are entities with which Massaro or Volpe was affiliated after Massaro left ICONICS.

## A.   *Project Foxtrot*

Volpe Industries worked in the surveillance camera business and sought to develop its own surveillance software.  This software development project, with which Massaro became involved, was known as Project Foxtrot.  Massaro has admitted that while still employed by ICONICS, he took ICONICS source code without permission for use in Project Foxtrot.  ICONICS first learned that Massaro was using its code in Project Foxtrot in August, 2008 and confronted him on September 16, 2008. Massaro resigned from ICONICS on January 6, 2009.

In the wake of the Project Foxtrot initiative, ICONICS commenced state and federal litigation.  In December 2009, the Suffolk Superior Court issued a declaratory judgment holding that ICONICS owned all of Massaro's interest in Project Foxtrot, due to employment contracts between ICONICS and Massaro. ICONICS, Inc. v. Volpe Industries, Inc., No. 09-0361-BLS2 (Mass. Super. Ct. Dec. 14, 2009).  In 2010, Volpe Industries filed for bankruptcy.  Those bankruptcy proceedings were marred by efforts to conceal the activities of Massaro and Volpe:

> It is undisputed that in the bankruptcy proceedings, Vince Volpe, the brother of Chris, set up a shell company to purchase and then wipe Volpe Industries' servers. The Bankruptcy Court expressed concern that it had been defrauded by this purchase and when ICONICS ultimately acquired those servers, found that 80,000 files had been deleted. It is also undisputed that Chris Volpe testified in the state court proceedings that he never knew that Massaro was using ICONICS software in his Project Foxtrot work but also stated in his deposition for this proceeding that he was in fact aware. ICONICS alleges, but defendants dispute, that in the state court litigation, Massaro and Volpe Industries intentionally withheld part of the source code to hide the fact that he had copied it from ICONICS.

ICONICS, Inc. v. Massaro, No. CV 11-11526-DPW, 2016 WL 199407, at *2 (D. Mass. Jan. 15, 2016).

**B.   *Energy Studio Pro***

Meanwhile, Massaro moved on to a new enterprise.  Two weeks after his resignation, Massaro began communicating with Rüdiger Bax, of the system integrator firm Bax Engineering GmbH, about possible work.  By June 2009 – ICONICS contends earlier –

3

Massaro's new consulting company was working with Bax Engineering on a new wind power software product called Bax Wind Power.  In February of 2010, Bax and Massaro formed a new German company, defendant BaxEnergy GmbH, to run renewable energy operations, as well as an Italian subsidiary defendant BaxEnergy Italia SRL (the two companies will be referred to herein as BaxEnergy).  The development history of Bax Wind Power begins in February 2010, after the formation of BaxEnergy, leaving a potential gap in the record regarding how the product was coded in the early stages of its development.

Over time, BaxEnergy developed the Bax Wind Power product into a new product, still focused on wind power, called Energy Studio Pro ("ESP").  ESP includes a SCADA component, which for one of its customers is provided by ICONICS and for other customers is provided by an ICONICS competitor.  The Volpe brothers were also involved with BaxEnergy.  Vince Volpe eventually purchased Mr. Bax's majority share of BaxEnergy. Chris Volpe founded a new company, defendant Vento Industries, Inc., which operates as an American partner or division of BaxEnergy providing sales and support in the American market.

ICONICS contends, among other things, that ESP was developed using misappropriated ICONICS code, provided by Massaro, violating both copyright protection and trade secrets law.  There is no dispute that at least some ICONICS code

appears in ESP.  A small, 150-line file of javascript ICONICS code known as webHMI.js can be found on the BaxEnergy source code repository.  Most of that code was also copied into a different file titled ScadaAutomation.js.  WebHMI.js allows clients to view relevant data visualizations over a web browser. That said, plaintiff's technical expert opined that webHMI.js is the *only* directly copied ICONICS code he found in Energy Studio Pro.  ICONICS alleges additional copyright and trade secret violations based on the development process itself.

## II. PROCEDURAL HISTORY

The original complaint in this proceeding was filed in August 2011, alleging only one count (copyright infringement) against only Massaro, for claims related to Project Foxtrot. ICONICS has amended its complaint twice, in May 2013 and April 2014, and now pleads ten causes of action against the current list of defendants.  Almost immediately after this litigation began, discovery disputes arose.  By the summer of 2014, ICONICS was complaining – as it still does – that it was being improperly denied access to BaxEnergy code, while defendants were complaining – as they still do – that ICONICS had not properly identified its trade secrets with specificity.  These issues, which have been litigated aggressively, have required consistent judicial oversight and intervention since then, as have other discovery matters.  They remain intertwined with the

instant summary judgment motions, both on the merits and as a continuing source of contention between the parties and their counsel.

In May, 2014, a separate settlement was reached that resolved all claims against Vince Volpe.  He is no longer a defendant in this matter.  Otherwise, motion practice has failed to narrow the scope of this litigation substantially.  On September 17, 2014, by oral order, I denied motions to dismiss by BaxEnergy and by Chris Volpe (with the exception of dismissing on preemption grounds state unfair business practice claims concerning copyright infringement) and denied defendants' motion to strike trade secret claims.

Earlier this year, on defendant's motion for partial summary judgment, I entered an order denying the motion in part (as to Massaro) on statute of limitations defenses and granting the motion in part (as to the trade secrets, intentional interference with contractual relations and DMCA claims against Christopher Volpe, and as to the copyright infringement claims related to Volpe Industries).  *ICONICS, Inc*. v. *Massaro*, No. CV 11-11526-DPW, 2016 WL 199407, at *1 (D. Mass. Jan. 15, 2016).

Now before me are two separate summary judgment motions brought by defendants, one concerning plaintiff's civil RICO and civil conspiracy claims and one concerning all other claims insofar as they relate to Energy Studio Pro (but focused almost

entirely on the intellectual property issues).  Notably, this
means that summary judgment is not sought as to the non-
BaxEnergy defendants for eight of ten counts.  For its part,
Plaintiff has moved for summary judgment on its claims under the
Digital Millennium Copyright Act ("DMCA").  In addition, there
are three motions to strike expert witness testimony under
*Daubert*, two from plaintiff, one as to defendant's technical
expert, Arthur Zatarain, and the other as to defendant's damages
expert, Bradford J. Kullberg, and one from defendants (as to
Jimmy S. Pappas, plaintiff's damages expert).  Finally, ICONICS
has a pending motion to compel discovery and for sanctions based
on long-standing discovery controversies.

     In this Memorandum and Order I consider and reject all
summary judgment motions with respect to the issues presented
except those raising trade secret claims, which I reserve,
awaiting the development of additional initiatives to clarify
the trade secrets at issue.  I will allow Plaintiff's motion to
compel as a predicate for further developments and clarification
of the disputed trade secrets.  I will treat as moot the motions
to strike the expert witness submission as to trade secrets in
light of such further trade secret claim clarification
initiatives.  I will reserve the motions to strike the damages
experts until further clarification of the substantive claims.

### III. STANDARD OF REVIEW

Under Rule 56, I may only grant summary judgment if there is no genuine dispute of material fact and if the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Carmona* v. *Toledo*, 215 F.3d 124, 132 (1st Cir. 2000). An issue is genuine if it "may reasonably be resolved in favor of either party." *Vineberg* v. *Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008). A fact is material if it could sway the outcome of the litigation. Id. In determining whether genuine disputes of material fact exist, all reasonable inferences must be drawn in the non-movant's favor. Id. Once the moving party has carried its burden, the burden shifts to the non-moving party, which must provide specific and supported evidence of disputed material facts. *LeBlanc* v. *Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993). The non-moving party "may not rest upon mere allegation or denials" and must "establish a trial-worthy issue." *Id*.

### IV. BAXENERGY COPYRIGHT CLAIMS

ICONICS has alleged both direct copying – specifically, in the form of the single webHMI.js file – and indirect copying in which defendants used ICONICS code while developing the Energy Studio Pro software but ultimately did not retain that code in ESP. Defendants raise two general arguments against ICONICS' copyright claims. First, they argue that the copyright

8

allegations are extraterritorial and therefore outside the scope
of domestic copyright law.  Second, they argue that the
copyright registrations covering ICONICS' products do not cover
the relevant, potentially copied code, barring an infringement
suit.  With respect to allegations of indirect copying,
defendants argue that the evidence of infringement is only
circumstantial and refuted by direct record evidence.  As for
WebHMI.js, where copying is admitted, defendants assert that the
file was either permissibly used under license or copied in a *de
minimis* fashion.  I address these contentions in turn.

### A.   *Extraterritoriality*

BaxEnergy is not an American company and Massaro's work for
it has not been performed in the United States.  Defendants
therefore argue that any potential copyright infringement is
extraterritorial and cannot give rise to liability under
domestic copyright law.  Defendants are correct that the
copyright laws do not generally extend extraterritorially.
*Elsevier Ltd*. v. *Chitika, Inc*., 826 F. Supp. 2d 398, 402 (D.
Mass. 2011) (quoting *Update Art, Inc*. v. *Modiin Publ'g, Ltd*.,
843 F.2d 67, 73 (2d Cir. 1988) ("It is well established that
copyright laws generally do not have extraterritorial
application.")).

But the predicate act exception to this general rule allows
for liability where a domestic act of copyright infringement

9

permits the later distribution, reproduction or other use
abroad.  *Update Art, Inc.*, 843 F.2d at 73; *see also Tire Eng'g &
Distribution, LLC* v. *Shandong Linglong Rubber Co.*, 682 F.3d 292,
308 (4th Cir. 2012) (per curiam) ("a plaintiff is required to
show a domestic violation of the Copyright Act and damages
flowing from foreign exploitation of that infringing act to
successfully invoke the predicate-act doctrine").  So long as
one connected act of infringement occurred in the United States,
there is no obstacle to liability on the basis that BaxEnergy
and Massaro worked outside the United States.

It is uncontested that Massaro's initial act of copying the
ICONICS code occurred while he was in the United States.  This
is uncontested.  Defendants now argue that it is conjectural
which files were copied and that, in any case, no nexus has been
shown between the domestic Project Foxtrot copying and the
alleged extraterritorial BaxEnergy copying.  But it would be a
permissible – although not necessary - inference for a jury that
the code in question traveled from ICONICS servers in the United
States to use by BaxEnergy through that first, potentially
extensive, act of copying in the United States.  If copyright
infringement were to be found, that would be the most plausible
pathway, given that ICONICS has mustered direct evidence of
copying domestically and no such evidence extraterritorially.
In short, there exists a genuine issue of material fact as to

whether this case falls within the predicate act exception to the extraterritorial limitation on copyright law and summary judgment is not appropriate on those grounds.[1]

## B.  *Copyright Registration*

The Copyright Act "requires copyright holders to register their works before suing for copyright infringement." *Reed Elsevier, Inc*. v. *Muchnick*, 559 U.S. 154, 157, (2010) (citing 17 U.S.C. § 411(a)).  Although this requirement is not jurisdictional, *id.,* it is an important element of an infringement claim.

ICONICS registered specific versions of three software products on May 17, 2013: GENESIS64 v. 10.4, from May 2010; GENESIS32 v. 9.10, from December 2007, and BizViz v.9.10, from April 2008.  Those registrations arguably excluded previously released versions of the software.  In its applications, in a space labeled "Material excluded from this claim," ICONICS wrote "Previously released versions of the work." Then, under "New

---

[1] Earlier this month, the Supreme Court reaffirmed its general approach to extraterritoriality in a fashion consistent with the development in the lower courts of the predicate act exception for copyright violations.  *RJR Nabisco, Inc*. v. *European Community*, 2016 WL 3369423 (U.S., June 20, 2016).  While not extraterritorial by terms, the Copyright Act – with its focus on whether copying occurred in the United States – can properly be invoked for extraterritorial application when, as here, the predicate act exception is applied to domestic copying integral to an extraterritorial violation.  *See generally Morrison* v. *Nat'l Australia Bank*, 561 U.S. 247, 266 (2010).

material included in claim," ICONICS wrote "Computer program, including various revisions and updates throughout the work." The "material excluded" section appears to exclude from the registration prior versions, although the "new material" section seems to limit the exclusion only to the revisions and updates it "includ[es]."[2]  Defendants argue that these registrations only cover the updates, that the unlawful copying was (or may have been) from earlier unregistered versions, and that ICONICS therefore cannot establish a prima facie case of copyright infringement sufficient to avoid summary judgment. Specifically, defendants claim that Massaro copied ICONICS code prior to the May 2010 release of GENESIS64 v. 10.4, meaning that he copied from an earlier unregistered version, and that the WebHMI.js code existed in unregistered versions of GENESIS32 prior to v. 9.10.

Defendants err, however, by contending for a particular categorical connection between the version of a work that is registered and the version of a work that is copyrighted and infringed upon.  Defendants correctly cite *Airframe Sys., Inc.* v. *L-3 Commc'ns Corp.*, 658 F.3d 100, 106 (1st Cir. 2011), as

---

[2] ICONICS asserts that this online form is misleading, because it includes "uneditable exclusion language" that is not present on the paper version of the same registration form.  Nevertheless, this is the form, and the exclusion language the plaintiff chose and a wholesale argument that the registration was unlawful would not seem to serve ICONICS' purpose.

requiring a plaintiff to present "sufficient evidence of copying (including substantial similarity) with respect to at least one of the . . . source code versions covered by its copyright registrations." But *Airframe* does not address the registration requirement, or to what extent a copyright registration can cover previous versions of a software program. It only addressed the need to show "substantial similarity" to prove copying, and the factual difficulties in that instance of showing such similarity across different versions of a program. Moreover, *Airframe* did not involve unregistered prior versions of software, but rather unregistered subsequent versions of software.

In *Airframe*, plaintiff compared an unregistered 2009 version of a software program to the allegedly infringing work, which was made using unauthorized access to code in or before 2003. The plaintiff's registered software versions dated from 1981 to 2003 and the plaintiff presented no evidence asserting how similar the 2009 version it analyzed was to the earlier versions that were infringed upon and which were registered. Given those facts, the First Circuit found that the plaintiff could not establish the "substantially similar" prong of the "copying" element of copyright infringement. Those factual issues are not implicated in this litigation on summary

13

judgment, where plaintiff's expert has supportably undertaken to quantify the overlap between the various versions.[3]

Also unlike *Airframe*, this case involves registered versions of software that postdate the potentially-infringed versions, not which precede it.  Registration of subsequent versions of a copyrighted work allows for infringement suits on past versions, even though the converse is not true.  *Compare Streetwise Maps, Inc*. v. *VanDam, Inc*., 159 F.3d 739, 747 (2d Cir. 1998) ("because Streetwise is the owner of the copyright of both the derivative and pre-existing work, the registration certificate relating to the derivative work in this circumstance will suffice to permit it to maintain an action for infringement based on defendants' infringement of the pre-existing work") *with Well-Made Toy Mfg. Corp* v. *Goffa Int'l Corp*., 354 F.3d 112, 115-16 (2d Cir. 2003) (abrogated on other grounds by *Reed Elsevier, Inc*. v. *Muchnick*, 559 U.S. 154 (2010)) ("Well-Made contends that the converse proposition—that registration of a

---

[3] Likewise, a District of Arizona case relied upon by the defendants involves a factual record without any evidence of how different versions of the relevant software built on each other. *AFL Telecommunications LLC* v. *SurplusEQ.com Inc*., 946 F. Supp. 2d 928, 941 (D. Ariz. 2013).  The court there noted that it had found the "effective registration doctrine" of cases like *Streetwise* applicable on a motion to dismiss, where it could "infer from the complaint that each successive software version incorporates the preceding versions," but could not do so without factual basis on summary judgment.  *Id.*  Here, plaintiff has put forward facts of the sort missing in that case.

claim on a pre-existing work confers jurisdiction over infringement claims regarding its derivative works—is also true. We conclude otherwise."). See also *Christopher Phelps & Associates, LLC* v. *Galloway*, 492 F.3d 532, 539 (4th Cir. 2007) ("While Phelps & Associates only registered the Bridgeford Residence design, that registration satisfied the prerequisite for suit under 17 U.S.C. § 411 for the entire design, even though some of it was created earlier in the form of the Bell and Brown Residence design"). Even if the previous versions of the three software programs were not included in the 2013 registration applications, those earlier registrations are sufficient to allow an infringement suit concerning the earlier versions of the software.[4]

---

[4] ICONICS also seeks to avoid a registration problem through another, less promising, mechanism. In response to the instant summary judgment motion, on May 16, 2016 ICONICS filed for copyright registrations on a set of older versions of GENESIS32 and GENESIS64.  In a January 15, 2016 memorandum in this litigation, I noted (without expressly holding) that "[g]enerally, a copyright registration filed after the infringement suit, but before the statute of limitations has expired, will cure the § 411 defect." *ICONICS, Inc.*, No. CV 11-11526-DPW, 2016 WL 199407, at *4 n.4.  However, I also noted that "where final judgment is sought before the copyright is registered, courts have dismissed the action." *Id.* citing *Kernel Records Oy* v. *Mosley*, 694 F.3d 1294, 1302 (11th Cir. 2012).  Registrations filed subsequent to a summary judgment motion may not necessarily cure a failure to register earlier. However, I find this issue immaterial for the reasons stated above.

## C.   *Intermediate Copying Claims*

ICONICS' expert, Mr. Hicks, has opined that BaxEnergy must have had a copy of ICONICS source code which it used during the software development process to ease, speed, and improve its own coding – even if most of that ICONICS code does not appear directly in BaxEnergy's products.

Defendants suggest in their briefing that this is "non-copying" that cannot form the basis of an infringement claim, although they cite no case law to that effect.  But creating intermediate copies of copyrighted code, even to develop one's own independently-written code, can be copyright infringement. *Sega Enterprises Ltd*. v. *Accolade, Inc*., 977 F.2d 1510, 1518-19 (9th Cir. 1992), as amended (Jan. 6, 1993) ("intermediate copying of computer object code may infringe the exclusive rights granted to the copyright owner in section 106 of the Copyright Act regardless of whether the end product of the copying also infringes those rights").  *See also* Terril Lewis, Reverse Engineering of Software: An Assessment of the Legality of Intermediate Copying, 20 Loy. L.A. Ent. L. Rev. 561, 564 (2000) ("A person who reverse engineers a piece of software will almost certainly infringe the copyright in that software through

the creation of an intermediate copy of the work").[5]  In part,
this is because each time a software program is run, it is
transferred to the computer's memory, creating a new copy.
*Soc'y of Holy Transfiguration Monastery, Inc*. v. *Gregory*, 689
F.3d 29, 55 (1st Cir. 2012) (quoting *MAI Sys. Corp*. v. *Peak
Computer, Inc*., 991 F.2d 511, 517–18 (9th Cir. 1993)) ("a
computer makes a 'copy' of a software program when it transfers
the program from a third party's computer (or other storage
device) into its own memory"); see also *Airframe Sys., Inc*. v.
*Raytheon Co*., 520 F. Supp. 2d 258, 267 (D. Mass. 2007), *aff'd*,
601 F.3d 9 (1st Cir. 2010) ("With regard to software, an act of
copying sufficient to violate the Copyright Act occurs each time
the software is run").  If adequately supported, an intermediate
copying claim can generate infringement liability.

Defendants also argue that the evidence of such
intermediate copying is merely circumstantial, largely
speculative, and rebutted by direct evidence.  But defendants'
arguments require the kind of weighing of evidence that is not
appropriate on summary judgment.  For example, Hicks identified
what he asserted to be nine months of missing software
development history from the repository of Massaro's consulting

---

[5] This type of copying can often be fair use.  *See Sony Computer
Entm't, Inc*. v. *Connectix Corp*., 203 F.3d 596, 602 (9th Cir.
2000).  But defendants do not assert a fair use defense here.

company, Anteasoft, during the period in which Massaro was
consulting for Bax Engineering.  ICONICS seeks to draw from that
gap various inferences about defendants' use of ICONICS code
during the undocumented period of time.  Defendants disagree and
put forward what they consider "the most reasonable explanation
of the facts," based on the deposition testimony of Massaro (who
testified that the missing months were the product of a transfer
of code made nine months after a separate back-up of the code
was created), to suggest that all their code was accounted for
and developed fully independently.  Adjudicating the credibility
of Massaro, or the reasonableness of one explanation over
another, is a matter for the jury, not for summary judgment.

Defendants also press a series of other plainly factual
arguments.  Defendants push back on Hicks' opinion that the
close interoperability between ICONICS software and Bax software
shows that defendants used ICONICS code while developing their
own programs, asserting that such interoperability could be
achieved instead from public documentation and the skills of a
system integrator (or on Massaro's own personal expertise in the
field) and citing their own expert's testimony.  Notably,
defendants have not moved to exclude Hicks' report or testimony
on *Daubert* grounds.  They simply disagree about his conclusions.
Likewise, when plaintiffs put forward evidence that Massaro sent
emails including two ICONICS copyright headers as suggesting

that he retained the source code those headers were previously
associated with, defendants respond by citing Massaro's
testimony that he retained those headers only to show that
ICONICS itself was misappropriating open source software. These
are disputes over facts and what inferences can be drawn from
the evidentiary record.  Defendants' objections to the
circumstantial evidence put forward by ICONICS are inadequate
arguments for summary judgment.

**D.   *Direct Copying Claims Related to WebHMI.js***

WebHMI.js is the only code in BaxEnergy's source code
repository that ICONICS has identified as identical to its own
code.  It is roughly 150 lines of javascript that was first
copied onto BaxEnergy's TFS source code repository and then
placed into a different file named ScadaAutomation.js.  It is
used by EDF-EN-Portugal, a BaxEnergy customer that also uses
ICONICS software, and allows clients to view ICONICS software
over a web browser.  Defendants admit that webHMI.js is ICONICS
code, copied and in use by BaxEnergy.  Their argument that this
is not copyright infringement as a matter of law is – in full –
that "whereas the 'use' to which the javascript code is made is
a licensed use by a licensed customer, ICONICS' copyright claim
as to WebHMI.js is licensed, or at best, de minimis."  This
entirely conclusory argument – made without citation to legal
authority or the factual record in defendants' original brief –

is not sufficient to support a summary judgment motion. *Cf. Nat'l Foreign Trade Council* v. *Natsios*, 181 F.3d 38, 61 n.17 (1st Cir. 1999), *aff'd sub nom. Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, (2000) ("arguments raised only in a footnote or in a perfunctory manner are waived").

ICONICS has mustered sufficient record evidence and argument to rebut these contentions.  It asserts that, as opposed to EDF-EN-Portugal, which did receive a license BaxEnergy never received a license to work with ICONICS software; that the license to EDF-EN-Portugal only allowed the creation of a single archival back-up copy but that at least three copies were made; and that webHMI.js could be found on BaxEnergy servers even before BaxEnergy began working with EDF-EN-Portugal.

The de minimis argument also lacks force.  ICONICS notes that webHMI.js allowed BaxEnergy customers to interoperate with ICONICS software while using a BaxEnergy-branded web interface, which it asserts to be of material value, and that the length of the code (as opposed to its effect) is irrelevant to a de minimis defense, see *Dun & Bradstreet Software Servs., Inc.* v. *Grace Consulting, Inc.*, 307 F.3d 197, 208 (3d Cir. 2002).  More importantly, the de minimis argument is simply inapplicable in this context.  The First Circuit has stated that a de minimis amount of copying is not a separate defense to copyright

20

infringement but rather "a statement regarding the strength of the plaintiff's proof of substantial similarity." *Situation Mgmt. Sys., Inc*. v. *ASP. Consulting LLC*, 560 F.3d 53, 59 (1st Cir. 2009). Moreover, the First Circuit found the de minimis exception inapplicable when infringement has also been alleged "through the overall structure and arrangement" of a work, as has been alleged in this case. *Id.* at 59 n.2. ICONICS has sufficiently raised a genuine issue of material fact on these defenses, particularly given the bare development of Defendants' claims concerning webHMI.js.

Because none of defendants' arguments for summary judgment proves persuasive, summary judgment is denied with respect to all of ICONICS' copyright infringement claims.

### V. CIVIL RICO AND CIVIL CONSPIRACY CLAIMS

In a second, separate motion, defendants also seek summary judgment on ICONICS' claims of a civil RICO violation and a civil conspiracy. To establish a RICO violation, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Efron* v. *Embassy Suites (Puerto Rico), Inc*., 223 F.3d 12, 14-15 (1st Cir. 2000) (quoting *Sedima, S.P.R.L.* v. *Imrex Co.*, 473 U.S. 479, 496 (1985)). Defendants here only contest the existence of the "pattern"

element of RICO liability.[6]  To demonstrate a "pattern," a
plaintiff must show two predicate acts of racketeering activity,
from the list set forth at 18 U.S.C. § 1961(1).  The plaintiff
must also show that those predicate acts "are related, and that
they amount to or pose a threat of continued criminal activity."
*Id.* (quoting *H.J. Inc*. v. *Northwestern Bell Tel. Co.*, 492 U.S.
229, 239 (1989).[7]

## A.   *Copyright Infringement as a Predicate Act*

To determine whether a pattern of racketeering activity can
be found, it is necessary to first establish which predicate
acts allegedly constitute the pattern.  ICONICS alleges that
defendants' RICO activity was comprised of criminal copyright
infringement under 18 U.S.C. § 2319, fraud against the

---

[6] Defendants do not admit the existence of the other elements,
but for the purposes of summary judgment their argument is
limited to the existence of a "pattern."

[7] Although not raised by the defendants in the motions before me,
I note that the Supreme Court's recent discussion of the
extraterritoriality of RICO treats the question of RICO as
derivative of the extraterritoriality of the underlying RICO
predicate statute.  *RJR Nabisco, Inc*. v. *European Community*,
2016 3369423 at *11 ("A violation of § 1962 may be based on a
pattern of racketeering that includes predicate offenses
committed abroad, provided that each of those predicate offenses
violates a predicate statute that is itself extraterritorial.").
As noted above, see Note 1 *supra*, there is sufficient evidence
here to support extraterritorial application of the Copyright
Act.  Moreover, from all that appears, Plaintiff has adduced
sufficient evidence to raise a genuine issue of whether it
suffered a domestic injury to its business or property, *RJR
Nabisco, Inc*. v. *European Community*, 2016 WL 3369423 at *15, to
support a private RICO cause of action under 18 U.S.C. §
1962(c).

bankruptcy court, and obstruction of justice under 18 U.S.C.
§1503.  All three are listed as predicate acts in the RICO
statute.  18 U.S.C. § 1961(1).  *Cf. Metro-Goldwyn-Mayer Studios
Inc*. v. *Grokster, Ltd*., 545 U.S. 913, 961, 125 S. Ct. 2764,
2793, 162 L. Ed. 2d 781 (2005)(Breyer, J., concurring)
("copyright infringement can be a predicate act under the
Racketeer Influenced and Corrupt Organizations Act").  Even so,
defendants argue that the copyright infringement alleged in this
case is not the sort of copyright infringement meant to serve as
a predicate act under RICO.  Only the most serious
counterfeiting and piracy, they contend, can serve as a
predicate act under RICO.

Defendants' narrow reading of the RICO statute draws some
force from the legislative history and consideration of the
purpose of the statute.  The court in *Stewart* v. *Wachowski*, No.
CV 03-2873 MMM VBKX, 2005 WL 6184235, at *5 (C.D. Cal. June 14,
2005), cited the legislative history, including committee
reports and statements in hearings, in concluding that when
Congress added copyright infringement to the list of predicate
acts under RICO, it did not mean to include all acts of
copyright infringement.  "Congress did not intend to criminalize
all intentional copyright infringement or subject all multiple
acts of intentional infringement to RICO liability. The
legislative history of the Anticounterfeiting Act reveals that

Congress's intent in expanding the list of RICO predicate offenses was to supplement existing sanctions against counterfeiting and piracy organizations." *Id.* at *5.  Other district courts have followed *Stewart* in holding that only the most "egregious" acts of copyright infringement can serve as RICO predicate acts.  *Helios Int'l S.A.R.L.* v. *Cantamessa USA, Inc.*, No. 12 CIV. 8205, 2013 WL 3943267, at *8 (S.D.N.Y. July 31, 2013) (citing Melville B. Nimmer & David Nimmer, 1 Nimmer on Copyright § 3.04[B][3] (2013)); see also *Robert Kubicek Architects & Associates Inc.* v. *Bosley*, No. CV 11-2112 PHX DGC, 2012 WL 3149348, at *2 (D. Ariz. Aug. 1, 2012).  That said, the legislative history mustered by the *Stewart* court serves only to show that counterfeiting and piracy were at the center of Congressional attention when Congress amended RICO; nothing suggests that Congress intended ordinary copyright infringement *not* to be a predicate act.

However, the plain text of the statute, not excursions through legislative history, governs here.  Racketeering is defined to include "*any* act which is indictable under" 18 U.S.C. § 2319 (emphasis added).  No limitation appears on the face of the statute.  Indeed, even the *Stewart* court found the relevant statutes "unambiguous on their face."  2005 WL 6184235, at *5. In the First Circuit, legislative history may only be used to interpret a statute where the plain text is unclear.  *United*

*States* v. *Godin*, 534 F.3d 51, 56 (1st Cir. 2008) (citing *United States* v. *Roberson*, 459 F.3d 39, 51 (1st Cir. 2006)) ("If the meaning of the text is unambiguous our task ends there as well.").

More fundamentally, the Supreme Court has repeatedly instructed that plain text governs in the particular context of RICO and rejected judicial attempts to narrow the legislatively-enacted text. See, e.g., *H.J. Inc.*, 492 U.S. at 245 ("It is argued, nonetheless, that Congress' purpose in enacting RICO. . . was to combat organized crime; and that RICO's broad language should be read narrowly so that the Act's scope is coextensive with this purpose. We cannot accept this argument for a narrowing construction of the Act's expansive terms."). Indeed, the Court specifically identified the "breadth of the predicate offenses" as driving the divergence of RICO's actual use from its intended anti-mobster purpose – and then stated that if a "correction" was sought, it "must lie with Congress."[8] *Sedima, S.P.R.L.* 473 U.S. at 499-500. If allowing all acts of criminal copyright infringement to serve as predicate acts under RICO sweeps too broadly, a narrowing interpretation is not "a form of

---

[8] For the same reason, defendants' many references to RICO as a "misused statute" and "the litigation equivalent of a thermonuclear device," *Goldfine* v. *Sichenzia*, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000) (quoting *Miranda* v. *Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)), are in this context little more than rhetorical throat-clearing.

statutory amendment appropriately undertaken by the courts."
The acts of copyright infringement proffered in the summary
judgment record here are sufficient to serve as predicate acts
under RICO.

**B.   *Continuity***

To survive summary judgment, ICONICS must show that the
various acts of copyright infringement, bankruptcy fraud, and
obstruction of justice it alleges could be found to be related
and continuous, sufficient to make a pattern.  It is clear, and
defendants do not contest, that the acts are related; they each
involve the same individuals (Massaro and the Volpe brothers)
and the allegedly repeated use and concealment of ICONICS
software code.  At issue is whether continuity existed.  A
plaintiff can show continuity under RICO in two ways.  "Under
the 'closed' approach, a plaintiff would have to prove a 'closed
period of repeated conduct' that 'amounted to ... continued
criminal activity.' Alternatively, under the 'open-ended'
approach, a plaintiff could satisfy the continuity requirement
by showing 'past conduct that by its nature projects into the
future with a threat of repetition.'"  *Home Orthopedics Corp*. v.
*Rodriguez*, 781 F.3d 521, 528 (1st Cir. 2015) (quoting *H.J. Inc*.,
492 U.S. at 237).  Under either approach, whether a pattern
exists is ultimately a question of fact.  *See e.g. Resolution
Trust Corp*. v. *Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993).

The courts and Congress have not offered a fixed formula for when, under the "closed" approach, repeated conduct rises to the level of continued criminal activity. *Home Orthopedics Corp.*, 781 F.3d at 529 ("both the Supreme Court and this court have declined to spell out specifically how many predicate acts, or how long the racketeering has to endure, for a plaintiff to satisfactorily allege the pattern requirement"). While "sporadic activity" or acts that span only a "few weeks or months" are not enough to establish continuity, *id.* citing *H.J. Inc.*, 492 U.S. at 239, 242, the First Circuit has instructed only that closed-ended continuity should be found "where the temporal duration of the alleged activity and the alleged number of predicate acts are so extensive that common sense compels a conclusion of continuity." *Id.* (citing *Giuliano* v. *Fulton*, 399 F.3d 381, 387 (1st Cir. 2005)). This case clearly falls between those poles. Plaintiffs have alleged racketeering activity beginning in 2008 and continuing with some regularity to the present. Even so, a finding of continuity is not outright compelled, given the divisibility of the racketeering into three discrete episodes (allegations related to Project Foxtrot infringement, the Foxtrot cover-up, and BaxEnergy). *But see Efron*, 223 F.3d at 18 (collecting cases suggesting that patterns of racketeering lasting over four and one-half years likely to satisfy closed-ended continuity).

27

In such intermediate cases, the First Circuit has
identified other factors that point toward closed-ended
continuity, including whether defendants were engaged in
multiple schemes, whether the schemes affected more than a
"closed group of targeted victims," and whether the scheme could
"last indefinitely" or have a "finite nature." *Id.* (citing
*Efron*, 223 F.3d at 18-19). These factors are meant to support a
"natural and commonsense approach to RICO's pattern element" and
help determine whether the acts alleged comprise the "kind of
broad or ongoing criminal behavior at which the RICO statute was
aimed." *Efron*, 223 F.3d at 18. Analyzing these factors, it is
clear that summary judgment is inappropriate on this issue.
While the set of victims alleged by plaintiffs is not expansive,
it includes not only ICONICS but also, through the frauds
committed in the bankruptcy process, the bankruptcy court and
bankruptcy trustee. The number of schemes alleged is similarly
finite – particularly if the bankruptcy frauds are understood
only as a cover-up adjunct to Project Foxtrot – but not "one
scheme with a singular objective." *Efron*, 223 F.3d at 18. A
jury reasonably could find these factors pointing toward the
existence of a pattern. Likewise, the factual nature of
BaxEnergy's ongoing use of ICONICS code, and therefore whether
the scheme could last indefinitely, is hotly contested. A
genuine issue of material fact remains on whether closed-ended

continuity – and therefore a "pattern" under civil RICO –
exists.  Summary judgment is denied on plaintiff's civil RICO
claims.

Because a jury could find continuity under a closed-ended
approach, I need not decide whether a jury could also find open-
ended continuity.  But for the sake of completeness and in
anticipation of trial, I note that open-ended continuity also
involves genuine factual disputes for the jury.  To show open-
ended continuity, a plaintiff must demonstrate "that the
racketeering acts themselves include a specific threat of
repetition extending indefinitely into the future [or] ... are
part of an ongoing entity's regular way of doing business."
*Home Orthopedics Corp.*, 781 F.3d at 531 (quoting *Feinstein* v.
*Resolution Trust Corp.*, 942 F.2d 34, 45 (1st Cir. 1991)).  An
inference of open-ended continuity is further supported by
evidence that defendants would repeat their racketeering acts in
new contexts, *Kenda Corp*. v. *Pot O'Gold Money Leagues, Inc*., 329
F.3d 216, 233 (1st Cir. 2003) ("If Kenda had produced evidence
that the defendants had plans to take over another company or
pool league in the same fraudulent manner, they might have had a
stronger argument" for open-ended continuity), or that
defendants' scheme lacks a definite "soon-to-be reached
endpoint," *Efron*, 223 F.3d at 20.  ICONICS alleges that
defendants have now perpetrated the same scheme twice – once

29

with Project Foxtrot and once with BaxEnergy – and would do so

again.[9]  The extent to which copyright infringement at BaxEnergy

is entirely in the past or continues into the present and likely

the future, is a contested question of fact for the jury.  That

jury could therefore find a threat of repetition and open-ended

continuity.  For this reason, as well, I deny summary judgment

on plaintiff's civil RICO claims.

## C.    *Civil Conspiracy*

Because defendants seek to dismiss plaintiff's civil

conspiracy claims only on the grounds that they rise and fall

with plaintiff's civil RICO claims, I deny summary judgment on

the civil conspiracy count as well.

---

[9] ICONICS also asserts that Mr. Massaro is currently threatening
to repeat the scheme if BaxEnergy loses this litigation.  In an
email to the CEO of ICONICS, Massaro warns that if ICONICS wins
this litigation, BaxEnergy will close and "All the engineers in
Catania will open their own business within a day and your
failure will be evident to everyone, and instead of dealing with
me alone now you will be dealing with 50 new software business."
While indicative of the bad blood coursing through this dispute,
this email may also be read to raise a genuine issue of material
fact regarding Massaro's threat of continued racketeering (as
opposed to increased lawful competition).  Defendants claim this
statement is inadmissible because it was made in a settlement
conversation, but Federal Rule of Evidence 408 only limits the
use of settlement conversations "to prove or disprove the
validity or amount of a disputed claim or to impeach by a prior
inconsistent statement," neither of which is the purpose for
which it is offered here.

## VI.  DMCA CLAIMS

ICONICS has moved for summary judgment on its claims under the Digital Millennium Copyright Act ("DMCA").  ICONICS contends that Massaro first removed copyright management information ("CMI"), in violation of 17 U.S.C. § 1202(b), and then replaced it with false CMI in violation of 17 U.S.C. § 1202(a).

The DMCA prohibits the use of false CMI, and provides that "No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement provide copyright management information that is false, or distribute or import for distribution copyright management information that is false."  17 U.S.C. § 1202(a).  It further prohibits the removal or alteration of CMI, providing that

> [n]o person shall, without the authority of the copyright owner or the law—(1) intentionally remove or alter any copyright management information, (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law ... knowing ... that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b).  *See also Photographic Illustrators Corp. v. Orgill, Inc.*, 118 F. Supp. 3d 398, 406 (D. Mass. 2015).

The primary source of information at issue in this litigation is "copyright headers" included in a variety of ICONICS source code files.  These headers are comprised of relatively human-readable text at the top of a file of code.  A

header might begin by reading "Copyright (c) 1986-2006 ICONICS, Inc. (copyrighted as an unpublished work). CONFIDENTIAL: Contains TRADE SECRET information" and then provide the name of the original author of the file.  ICONICS alleges that, on more than one occasion, Massaro transferred ICONICS files onto servers of Volpe Industries, removed the ICONICS copyright headers, and replaced them with new Volpe headers.  ICONICS also asserts that the code itself in these files often referred to ICONICS as "Ico" and that those references were replaced in the code itself with "Fox" (for Volpe Industries' "Project Foxtrot").  It is uncontested that for at least two files, on September 17, 2008, Massaro deleted an ICONICS copyright header and replaced it with a Volpe Industries copyright header. Whether Massaro did so for 280 other files, however, is contested.

These copyright headers are paradigmatic CMI.  Copyright management information is defined as information conveyed in connection with copies of a work, including in digital form.  17 U.S.C. § 1202(c).  More specifically, CMI is limited to eight categories of information, including the title of a work, the author of a work, the copyright owner of a work, and the terms and conditions for using a work, among others.  *Id.*  The headers used by ICONICS convey at least information about the copyright owner, author, and certain terms of use for the file (i.e.,

confidentiality), and are conveyed along with the source code files precisely to keep this identifying information together with the code.  These headers plainly fall under the statutory definition.  In the software code context, even information integrated into the code itself can also be CMI, where it reveals authorship.  *See, e.g., Bounce Exch., Inc*. v. *Zeus Enter. Ltd*., No. 15CV3268 (DLC), 2015 WL 8579023, at *3 (S.D.N.Y. Dec. 9, 2015) ("Weaving CMI into the text of the source code may be among the most efficient or security-enhancing ways to include CMI with that code").  The in-line references to "ico" and "fox," too, are CMI.

Defendants' efforts to argue that this information is not CMI are unpersuasive.  They argue, for example, that because the headers mention both copyright and trade secrets, it is not clear whether the files are copyrighted, trade secrets, or both. Given that defendants admit that a file could contain both trade secrets and copyrighted material, however, it is not clear why the inclusion of a trade secret marker negates the header's status as CMI.  Likewise, defendants question whether headers on individual files can be CMI when the copyright at issue covers the full versions of programs, not individual files.  But the definition of CMI neither states nor implies that CMI can only exist with regard to the full version of a work, instead requiring that the information be "conveyed in connection with

33

copies … of a work."  17 U.S.C. § 1202(c).  Putting headers in individual files is how headers can be conveyed with the software itself. Indeed, courts have been concerned with the opposite problem: defining as CMI blanket assertions of copyright that are not linked to the individual works or items in circulation.  *Pers. Keepsakes, Inc*. v. *Personalizationmall.com, Inc*., No. 11 C 5177, 2012 WL 414803, at *7 (N.D. Ill. Feb. 8, 2012) (disapproving of DMCA claims where "a picture or piece of text has no CMI near it but the plaintiff relies on a general copyright notice buried elsewhere on the website").

Having established that the headers are indeed CMI, most elements of both DMCA claims are uncontested, at least for the two files where the header removal is admitted.  Defendants admit that ICONICS did not authorize any replacement by Massaro of its copyright headers.  They admit that Massaro deleted source code headers from at least two files that he copied to the Volpe Industries server and for those two files they admit that Massaro added a Volpe Industries header in its place. These two files were modified the day after ICONICS first confronted Massaro over his work for Volpe Industries.

Given these facts, defendants make two arguments in opposition to summary judgment.  First, they argue that Massaro did not "provide" or "distribute" false CMI because he only

34

uploaded the false CMI onto the private Volpe server, rather than broadcasting it more widely.  Contrary to defendants' protestations, however, courts have not held that "distribution" under § 1202(a) requires wide, public distribution.  The cases that defendants cite do, as a factual matter, involve the posting of false CMI on the Internet or in the phone book, but they do not even purport to require that kind of public distribution for liability as a matter of law.  *Granger* v. *One Call Lender Servs., LLC*, No. CIV.A. 10-3442, 2012 WL 3065271, at *4 (E.D. Pa. July 26, 2012); *Stockwire Research Group, Inc*. v. *Lebed*, 577 F. Supp. 2d 1262, 1267 (S.D. Fla. 2008); *Gregerson* v. *Vilana Fin., Inc*., No. CIV.06-1164 ADM/AJB, 2008 WL 451060, at *7 (D. Minn. Feb. 15, 2008).  They do not even address the issue.  Nor do DMCA cases always involve the broad public dissemination of CMI.  *See, e.g., Med. Broad. Co.* v. *Flaiz*, No. CIV.A. 02-8554, 2003 WL 22838094 (E.D. Pa. Nov. 25, 2003) (defendant disclosed former employer's confidential information to his new employer).  Moreover, even if Massaro had not "distributed" the false CMI, he surely "provided" it.

Second, defendants argue that there is insufficient evidence of intent and knowledge here.  Massaro has testified that he believed that he was permitted to use the code in question for non-competitive side projects, which he believed Project Foxtrot to be.  He also testified that he replaced the

ICONICS headers with Volpe headers only after learning that
ICONICS was upset with him as an attempt to "separate" the two
companies' code.  According to his testimony, he did not remove
or alter CMI to facilitate infringement because he believed that
he was doing nothing wrong and then simply cleaning up a mess.
ICONICS, for its part, argues that this testimony so lacks
credibility that it does not raise a genuine issue of material
fact.  They point, for example, to the fact that Massaro changed
*only* the headers, not the substance of the code, and that he
made the changes secretly after being confronted by ICONICS.
While these facts raise serious questions about Massaro's
testimony, they are fundamentally credibility determinations
inappropriate for summary judgment, and all the more
inappropriate on questions of intent, which are best left for a
jury.  *Hodgens* v. *Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st
Cir. 1998) (particular caution required in granting summary
judgment on questions of intent).  Because a genuine dispute
exists over Massaro's intent, summary judgment is denied on
ICONICS' DMCA claims.  Accordingly, I do not reach defendants'
arguments about the scope of their DMCA liability.

## VII. REMAINING BAX ISSUES

Certain additional claims against BaxEnergy are also the
subject of summary judgment.  Defendants have moved for summary
judgment as to BaxEnergy on these issues, although they did not

provide extensive briefing on their arguments for summary judgment.

Count IV of the operative complaint alleges intentional interference with contractual relations by BaxEnergy, concerning Massaro's confidentiality agreement with ICONICS.  Defendants claim (citing no law) that this claim must be dismissed because BaxEnergy was formed two years after Massaro left ICONICS and Massaro is a partial owner of BaxEnergy.  It is entirely unclear why Massaro's ownership of BaxEnergy is relevant to this claim, and given that Massaro's contractual duties of confidentiality presumably extend beyond the date of his leaving ICONICS, the date that BaxEnergy was formed seems equally irrelevant. Summary judgment is denied on this count.

Defendants also move for summary judgment on Counts V and VI, related to the DMCA, with respect only to defendant BaxEnergy.  They assert, correctly, that ICONICS has put forward no evidence of DMCA violations by BaxEnergy, with respect to Energy Studio Pro.  Moreover, ICONICS does not oppose this aspect of defendants' motion in its opposition brief.  Summary judgment will be granted for the BaxEnergy defendants on Counts V and VI.

With respect to Count VII and VIII, concerning unfair competition under Massachusetts statute, Mass. Gen. L. ch. 93A, and common law, defendants argue only that these claims rise and

37

fall based on the existence of copyright and trade secret claims.  Because I have denied summary judgment on the copyright claims, I deny summary judgment with respect to the unfair competition claims.

### VIII. CONCLUSION

For the reasons set forth above, I DENY so much of defendants' motion for summary judgment [Dkt No. 424] concerning the BaxEnergy Energy Studio Pro product that does not relate to trade secrets, and deny the motion as to trade secrets without prejudice in anticipation of further proceedings to clarify the trade secret contentions of the parties of DMCA violations.  I DENY defendants' motion for summary judgment [Dkt No. 417] on the civil RICO and civil conspiracy claims and I DENY plaintiff's motion for summary judgment [Dkt No. 413] on its DMCA claims.  I treat as moot the motion [Dkt. No. 415] to strike the testimony of Arthur Zatarain.  I deny without prejudice the motion [Dkt. No. 414] to strike the report and testimony of Bradford J. Kullberg and the motion [Dkt. No. 421] to disqualify Jimmy S. Pappas and strike his report.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE