UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
ICONICS, INC.                   )
                                )
          Plaintiff,            )
                                )    CIVIL ACTION NO.
     v.                         )    11-11526-DPW
                                )
SIMONE MASSARO,                 )
CHRISTOPHER VOLPE, VENTO        )
INDUSTRIES, INC., BAXENERGY GmbH )
And BAXENERGY ITALIA S.r.L.,    )
                                )
          Defendants.           )
```

MEMORANDUM AND ORDER
July 19, 2017

Before me are motions to disqualify experts, which I now

take up and resolve as prelude to resolving defendants' motion

for summary judgment which I will address in a separate

Memorandum.

Defendants Simone Massaro, BaxEnergy GmbH, Christopher

Volpe, BaxEnergy Italia, and Vento Industries have moved

[Dkt. No. 541] to disqualify Jimmy Pappas and to strike his

expert report.   Plaintiff Iconics in turn has moved to exclude

the testimony of Arthur Zatarain [Dkt. No. 538] in its entirety

and the report of Bradford Kullberg [Dkt. No. 546] in part.

In considering these motions, I perform a gatekeeping role

through which I determine whether the expert testimony offered

by these witnesses is sufficiently reliable to be introduced

into evidence.  *United States* v. *Mooney*, 315 F.3d 54, 62 (1st

Cir. 2002).  Under Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in
> the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to
> determine a fact in issue; (b) the testimony is based on
> sufficient facts or data; (c) the testimony is the product
> of reliable principles and methods; and (d) the expert has
> reliably applied the principles and methods to the facts of
> the case.

I may consider a variety of factors when deciding whether to

admit an expert's testimony, including:

> (1) whether the theory or technique can be and has been
> tested; (2) whether the technique has been subject to peer
> review and publication; (3) the technique's known or
> potential rate of error; and (4) the level of the theory or
> technique's acceptance within the relevant discipline.

*Mooney*, 315 F.3d at 62 (citing *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993)).  Once it is

established that an expert's testimony "rests upon good grounds

based on what is known," however, I should allow the evidence to

be presented to the jury and "be tested by the adversarial

process." *Milward v. Acuity Specialty Products Group, Inc.*, 639

F. 3d 11, 15 (1st Cir. 2011) (internal quotation and citation

omitted).

## I. JIMMY PAPPAS

Jimmy Pappas is a forensic accountant serving as Iconics'

damage expert.  His opinion assumes liability has been

2

established and then estimates the amount of damages due in four categories: the intellectual property claims (taken together), breach of contract damages, Digital Millennium Copyright Act Damages ("DMCA") statutory damages, and attorneys' fees and costs in the related state and bankruptcy court proceedings.

## A.    *Qualifications*

As a threshold matter, defendants seek to exclude Pappas as an expert for being unqualified to opine on the subject matter. Pappas is a managing director in the forensic services practice of PricewaterhouseCoopers.  He is a certified public accountant and certified fraud examiner with experience in valuing damages related to fraud, breach of contract, and misappropriation of assets.  As defendants point out, however, Pappas does not have experience providing valuations of intellectual property in the context of litigation.

Given Pappas's theory of valuation, such a gap in his experience does not render his opinions unreliable.  Although Pappas has not negotiated licenses or sales of intellectual property, his opinion is not based on those approaches.  His approach focuses on forensic accounting, valuations of companies and investor contributions more broadly, and the calculation of profits.  These are subjects where he has the specialized skill sufficient to serve as an expert witness.

**B.   *Intellectual Property Claims***

Pappas provides two estimates of the damages owed for the intellectual property claims based on two different calculation methods.

The primary method he advances is a novel one he calls the "unwitting investment" method.[1]  Using this method, Pappas opines that because Iconics owns the intellectual property Massaro allegedly brought to BaxEnergy in return for a 49 percent stake in the company, Iconics should be viewed as an investor, albeit unwittingly, in BaxEnergy.  Pappas estimates the value of that investment at approximately $8 million.  Defendants argue that this "unwitting investment" method does not reflect the current law and therefore would not reliably assist the jury in calculating the appropriate measure of damages.  They do not contest Pappas's calculations; they contest only his underlying approaches.

Both Massachusetts trade secrets law and federal copyright law authorize damages based on theories of disgorgement and

---

[1] The alternative method he presents is a profit disgorgement analysis, a remedy generally available under both 17 U.S.C. § 504(b) and Massachusetts trade secret law.  The parties have been invited to file summary judgment motions as to whether Iconics has adduced sufficient evidence on damages to support its trade secret and copyright claims.  I will therefore determine the proper scope of Pappas's profit disgorgement theory in light of the resolution of those motions and will not address the motion to exclude on those grounds at this time.

unjust enrichment. *Bruce* v. *Weekly World News, Inc.*, 310 F.3d 25, 28 (1st Cir. 2002) ("A plaintiff who establishes copyright infringement is entitled to recover (1) actual damages, which consist of all income and profits lost as a consequence of the infringement; and (2) any nonduplicative profits earned by the defendant as a consequence of the copyright infringement, see 17 U.S.C. § 504(b)"); *Jet Spray Cooler, Inc*. v. *Crampton*, 385 N.E.2d 1349, 1356 (Mass. 1979) ("The measure of damages in cases involving business torts such as the misappropriation of trade secrets entitles a plaintiff to recover full compensation for his lost profits and requires a defendant to surrender the profits which he realized from his tortious conduct.").

In order to establish defendants' unjust profits, plaintiffs must "'do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement.'" *Real View, LLC*. v. *20-20 Techs., Inc*., 811 F. Supp. 2d 553, 560-61 (D. Mass. 2011) (quoting *Polar Bear Prods., Inc*. v. *Timex Corp*., 384 F.3d 700, 711 (9th Cir. 2004)). But, "[o]nce the plaintiffs demonstrate that the defendants have made profits from sales of products incorporating the misappropriated trade secrets, the burden shifts to the defendants to demonstrate the portion of their profits which is not attributable to the trade secrets." *See Jet Spray Cooler*, 385 N.E.2d at 1359 n.14.

Pappas's "unwitting investment" theory of damages cannot be accepted as a reliable methodology here for calculating damages in this instance.  The approach strays from the traditional lost profits theory of damages under trade secrets and copyright unjust enrichment law towards a property-based conception of liability in which misappropriation of intellectual property provides the victim with the equivalent of an equity share in the misappropriator's enterprise.  Neither Pappas nor plaintiff's counsel have identified any case that uses such an approach.  Rather, plaintiff simply invokes the Supreme Judicial Court's reminder that while "traditional lost profits analysis as a measure of damages may not be an adequate model" in all trade secret cases "other theories of damages may . . . be ripe for testing in our courts." *Lightlab Imaging, Inc.* v. *Axsun Techs., Inc.*, 13 N.E.3d 604, 614 (Mass. 2014).

In *Lightlab*, the court sought to protect companies, in particular start-up companies, that fall victim to trade secret misappropriation before they have yet to show a profit.  *Id.* The court recognized that strict application of the lost profits measure for damages could bar these companies from recovery and therefore the court indicated that a company facing that dilemma should be allowed to present alternative theories of damages. *Id.* ("Such businesses often operate for years without profit. This fact should not render them 'damage proof.'").  Unlike the

hypothetical companies addressed in *Lightlab*, it appears Iconics
could have relied on a traditional method to capture the damages
at issue fully, and indeed has offered a profit disgorgement
analysis for at least some of its claims. I therefore see no
basis to employ a novel and untested theory of liability under
these circumstances and will strike Pappas's testimony regarding
the unwitting investment theory.

**C.  *Contract Damages***

Defendants seek to exclude Pappas's testimony concerning
contract damages on two grounds. First, they argue that his
testimony addresses claims not properly remaining in the case.
Second, they argue that his calculations include damages that
were not foreseeable, in derogation of contract law. These
objections are not the proper focus of a *Daubert* inquiry. They
are legal arguments against the plaintiff's theory of the case
and the predicate factual proof to support an expert opinion. I
have not foreclosed contractual claims and it is premature to
address the availability of expert testimony regarding resultant
damages until the underlying evidence regarding that matter is
adduced. I will not strike Pappas's testimony on these grounds.

**D.  *DMCA Damages***

Similarly, defendants' objection to Pappas's DMCA damages
testimony falls outside the scope of a *Daubert* challenge.
Defendants have legal disagreements with plaintiff over what

constitutes an individual DMCA violation.  This is an important legal question which remains unsettled in this circuit and in this case.  Plaintiff asserts that there were 282 violations; defendants counter that the number of violations, if any, should be in the single digits.  In creating his expert report, however, Pappas permissibly accepted plaintiff's legal interpretation and calculated damages for 282 violations.  To be sure, all Pappas did to calculate DMCA damages was multiply the number of violations by the statutory range for damages.  Even if his testimony here serves a limited need, it is reliable and will not be excluded if the factual predicates for DMCA violations are established.[2]

## II. ARTHUR ZATARAIN

Iconics has moved to exclude the testimony of Arthur Zatarain, defendants' technical expert.  Zatarain produced his expert report on March 10, 2016.  After Iconics filed its narrative description of its asserted trade secrets, Zatarain issued a supplemental report on August 24, 2016.[3]  Because Zatarain's supplemental report incorporates his initial report to the extent that it is consistent with the March 10, 2016

---

[2] I note that the parties have been invited to file summary judgment motions as the case advances to trial as to the number of individual violations of the DMCA, if any, that are at issue.
[3] Zatarain also filed a supplement to his supplemental report on August 31, 2016, adding two citations inadvertently left out of his supplemental report.

report, I consider Iconics' challenges to both the initial
report and the supplemental report.

Iconics contends there are numerous shortcomings in
Zatarain's analysis and therefore seeks to exclude his testimony
entirely or, in the alternative, to exclude those problematic
areas of his testimony.  *See Bricklayers & Trowel Trades Int'l
Pension Fund* v. *Credit Suisse Sec*. *(USA) LLC*, 752 F.3d 82, 96
(1st Cir. 2014) (district court may exclude witness rather than
"prune away" inadmissible testimony).  I begin with Iconics'
challenges to Zatarain's methodology and then discuss his
analysis of Iconics' alleged trade secrets.

## A.   *Methodology*

In both of its motions, Iconics criticizes the methods
Zatarain used to construct his report.  Iconics argues that he
improperly relied on Massaro and other BaxEnergy employees to
interpret its trade secrets, that he never inspected Iconics'
code directly (with the single exception of the webHMI.js file),
and that he did not use Iconics technical documents which even
he admitted would have helped him better understand the trade
secrets.  Iconics builds upon these arguments in its second
motion, pointing to Zatarain's deposition where he struggled to
explain clearly how BaxEnergy's source code supported his
opinions.  Defendants mostly do not contest Iconics'

characterization of Zatarain's approach, but rather argue that there is nothing improper about it.

An expert is responsible for ensuring that his opinion is based on reliable data; he may not blindly rely on his client's representations. *SMS Sys. Maint. Servs., Inc*. v. *Digital Equip. Corp*., 188 F.3d 11, 25 (1st Cir. 1999) ("[A]n expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession."); *Rand A Tech. Corp*. v. *Parametric Tech. Corp*., No. 03-CV-11046-MEL, 2005 WL 6768210, at *1 (D. Mass. Oct. 19, 2005) ("An expert must do more than simply rely on a client's representations."). Nor may an expert "parrot" the conclusions of other witnesses, although an expert may rely on other witness's testimony or other expert conclusions to form an opinion. *See, e.g., Thorndike* v. *DaimlerChrysler Corp*., 266 F. Supp. 2d 172, 185 (D. Me. 2003). Ultimately, however, it is the factfinder's role to evaluate the credibility of an expert's testimony, which may include a consideration of the data underlying the testimony. *See Milward*, 639 F.3d at 22 ("When the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury.").

Zatarain's reliance on BaxEnergy employees to assist him in interpreting the code at issue coupled with his struggles to explain the relevant code at his deposition may be a rich subject for cross-examination.  But, absent evidence that Zatarain merely adopted defendants' statements about the trade secrets wholesale, the jury should be given the opportunity to evaluate the credibility of Zatarain's opinion.

**B.   *Trade Secret Analysis***

Iconics objects to Zatarain's discussion of the core architecture, data intake, and workflow trade secrets alleged. This objection is directed both to his conclusion that BaxEnergy employs none of these purported trade secrets and to his conclusion that all of these purported trade secrets have been publicly disclosed.  I will evaluate each of these challenges in turn.

1.   Core Architecture

In its initial motion, Iconics argues that Zatarain's opinion on the core architecture trade secret is unreliable because he bases it exclusively on his analysis of three architectural diagrams, rather than on an examination of the underlying source code.  Zatarain's supplemental report adopts, without any changes, his conclusion that BaxEnergy does not use Iconics' core architecture trade secret.  Zatarain admitted in his deposition that looking at the code would add to his

understanding, although how much this is so is disputed.
Defendants contend that code-level information is not necessary
to analyze the core architecture trade secret.

Regardless of the benefits of any alternative approaches,
Zatarain's opinion on the core architecture trade secret is
sufficiently reliable to be presented to the jury.  Iconics
itself, in its narrative description, uses architectural
diagrams, with accompanying annotations, to explain the
implementation of its core architecture trade secret.  Even if a
code-based analysis, like the analysis performed by Iconics'
expert Christian Hicks, provides a more precise description of
Iconics' trade secret, Zatarain's analysis nevertheless
illuminates aspects of the core architecture trade secret and
how it allegedly differs from BaxEnergy's core architecture.
Any questions on the comparative weight or credibility of these
two analyses are questions for a jury to resolve.

Iconics also contests Zatarain's comparison of both
BaxEnergy and Iconics' software to a generic SCADA framework,
represented in the Daneels study, as a way of determining
whether BaxEnergy used Iconics' core architecture.  Zatarain
altered the generic Daneels diagram in order to compare the two
products involved in this litigation more easily.  In that
process, he modified not only the placement of components but
also the connections between them.  In his deposition, he

12

explained that this was done where certain connections were not relevant, or where relevant connections were not portrayed graphically, for example.  Although Zatarain's expert report did not explain the modifications, Iconics fails to identify any particular modification that lacks grounding.  Because Zatarain provided some explanation, albeit belatedly, for the modifications and in the absence of evidence showing how these modifications make Zatarain's methodology unreliable, I find this to be a matter for cross-examination.

Finally, Iconics disputes Zatarain's analysis regarding the public disclosure of the core architecture trade secret.  In its initial motion, Iconics argues that Zatarain fails to explain sufficiently how a 2008 diagram published by Iconics disclosed its core architecture trade secret.  Zatarain's supplemental report includes further analysis of how the 2008 diagram and other public Iconics materials from around that time may be found to disclose the core architecture trade secret as presented in the narrative description.  Zatarain's analysis on this subject may be somewhat conclusory and underdeveloped, but it has enough grounding and support to be presented to the jury. Similarly, Iconics' argument that Zatarain's supplemental report does not list the documents that actually disclose the core architecture trade secret fails.  Zatarain's supplemental report identifies the 2008 architectural diagram, the explanatory

13

content in the "Genesis 64 Technical Overview," and the disclosures found in the commercial offering of BizViz, which includes BridgeWorkX, ReportWorX, and Mobile HMI modules. Although he does at times speak broadly about "other public Iconics material," there are enough specific references to ground his opinion and plaintiff remains free to cross-examine Zatarain about such matters. *See Int'l Adhesive Coating Co., Inc*. v. *Bolton Emerson Int'l., Inc.*, 851 F.2d 540, 544 (1st Cir. 1988) ("The burden is on opposing counsel through cross-examination to explore and expose any weaknesses in the underpinnings of the expert's opinion.").

   2.   Data Intake

   Iconics argues that Zatarain fundamentally misunderstands its data intake trade secret and therefore contends that his testimony would not be helpful to the jury.  Defendants counter that Iconics has altered its definition of the data intake trade secret throughout this litigation and that Zatarain's testimony responds to these evolving definitions.  Zatarain opines in his supplemental report that the term "data intake" is not commonly used in relation to SCADA software and then points out the similarities between Iconics' narrative definition of the data intake trade secret and other common data acquisition methods and concepts.  Zatarain's report traces the history of Iconics' attempts to define its data intake trade secret, compares it to

14

standard practices in the industry, and concludes that Iconics
current definition is a post-hoc attempt to recreate the trade
secret in light of potential public disclosures.  Zatarain does
briefly engage with the narrative description's definition of
the trade secret, analyzing BaxEnergy source code to conclude
that BaxEnergy at the very least does not employ the data intake
trade secret in the way Iconics has implemented that trade
secret.  Although Zatarain may not reply fully to Iconics'
current definition of its data intake trade secret, his
testimony may be helpful to a jury in light of defendants'
theory of the case.  Zatarain's data intake testimony will not
be excluded.

    3.   <u>Workflow</u>

    Relying on Zatarain's initial report, Iconics argues that
Zatarain improperly concluded that all workflow functions in ESP
were performed by third-party Microsoft software and therefore
did not include the Iconics workflow trade secret.  Iconics
points out that in his deposition testimony Zatarain admitted
that BaxEnergy wrote its own code that "wraps around" the
Microsoft product and manages the same issues of triggering
events that the workflow trade secret involves.  Iconics also
criticizes Zatarain for not citing the BaxEnergy code that uses
the Microsoft product to accomplish similar ends.  In response,
defendants repeat their arguments on the merits of the case,

claiming that the ESP technique is different than the Iconics technique, and contesting the allegedly shifting trade secret descriptions.  I do not find this an adequate response to evidence of inaccuracies and gaps in an expert's methodology. Because of the differences in the workflow trade secret sections in Zatarain's initial report and in his supplemental report, I read his supplemental report to supplant the earlier report for this section.  But, for the sake of clarity and completeness, I will exclude Zatarain's testimony from his initial report concerning the use of Microsoft software for workflow functions.

Iconics asserts that Zatarain's discussion of the workflow trade secret in the supplemental report is without support, relying on his shaky responses to plaintiff's counsel's questions during his deposition.  Zatarain repeatedly stated that parts of BaxEnergy's source code were "too complicated" for him to explain and that, at the time of his deposition, he could no longer "go into the details of the code."  Zatarain did, however, attest that he understood the workings of the code well enough at one time to create diagrams of the workflow trade secret.  Moreover, he freely admitted that he received assistance from Massaro and other BaxEnergy employees in order to learn about how the code functions.  As discussed above, Zatarain's deposition statements and his reliance on BaxEnergy employees may create fertile grounds for cross-examination, but

they do not establish that Zatarain is merely "parroting" the views of BaxEnergy and Massaro.  *See Thorndike*, 266 F. Supp. 2d at 185.  I therefore will not exclude Zatarain's evidence as crystalized in his supplemental report on the workflow trade secret.

Iconics also, in its initial motion, argues that Zatarain conceded at deposition that the workflow trade secret has not been publicly disclosed and therefore should be excluded from testifying at trial to the contrary.  Defendants dispute this reading of Zatarain's deposition and claim that his report contains ample evidence showing that the workflow trade secret was in the public domain.  Such factual disputes fall outside the proper scope of a *Daubert* inquiry.  In his supplemental report, Zatarain analyzes several generic workflow structures to conclude that the workflow secret has been publicly disclosed. To the degree Iconics seeks to pursue the contention that Zatarain's earlier statements are inconsistent with his final conclusions, it may do so at trial.

**C.   *Software Development***

Zatarain's initial report also includes a discussion of the history of software development at BaxEnergy.  Iconics seeks to exclude this testimony on the grounds that it merely repeats information of percipient witnesses, such as Massaro, without adding any meaningful expertise.  Defendants respond that

17

Zatarain's historical background information was meant to rebut
Hicks's report, which includes similar background, and
references a variety of documents and sources outside of the
statements of potential fact witnesses.  This issue is best
addressed in the context of trial.  Defendants will not be
permitted to use Zatarain to introduce factual or historical
background that is not rooted in his direct analysis or
professional expertise, but some background may be needed to
frame his views.  Moreover, certain opinions, as a matter of
order of proof, may be appropriate only after another fact
witness lays a proper foundation on which Zatarain can rely, but
not before.  An individualized inquiry, employed in light of
evidence and opinions as introduced, is preferable here.  I do
not exclude this testimony for now.

**D.  *Interoperability***

Iconics seeks to exclude Zatarain's testimony from his
initial report concerning the interoperability of Iconics and
BaxEnergy software, in which he opines that the way the two
programs interoperate does not indicate any special possession
or use of Iconics materials in developing ESP.  First, Iconics
criticizes Zatarain for asserting that "documents provided by
Iconics" support his conclusion when his report fails to
identify the documents to which he refers.  Defendants respond
that Zatarain was simply referencing the same materials that

18

Hicks did in his report, without providing new citations.  These minor oversights in citation, while frustrating to the reader, do not, by themselves, require this testimony to be excluded.

Zatarain's failure, however, to explain his conclusions and methodology beyond blanket assertions in this section leads me to exclude this testimony.  Iconics points to several instances of unsubstantiated and conclusory testimony throughout this section.  For example, in response to testimony from Hicks that there was an unauthorized interaction between the security features of the two programs, Zatarain's expert report states that "[c]onfiguring the Iconics security features was done at the request of the Iconics customer who no longer desired to have separate login procedures for the Bax and Iconics software. Configuring the Iconics security features in no way involved proprietary information or access to the software." [Dkt. No. 457, Ex. 1, ¶ 23.7.3].  I agree that this opinion, and others in this section, lacks any methodological explanation.  I need not "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert," and will exclude Zatarain's testimony concerning interoperability.  *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

**E.   *Retention of Source Code***

Iconics also seeks to exclude Zatarain's testimony concerning Massaro's possession of two Iconics source code files

in September 2009, which Iconics claims can be inferred from
Massaro emailing copyright headers to Volpe Industries attorneys
at that time.  Iconics argues that Zatarain's testimony here
merely repeats the testimony of Massaro without any additional
analysis.  Zatarain opines that Massaro's explanation of the
presence of these copyright headers is plausible, basing his
opinion both on Massaro's testimony and on his own
interpretation of third-party files.  As with certain of the
other statements by Zatarain previously discussed, this
testimony teeters on the fine line between permissible reliance
on the statements of another witness and impermissible parroting
of a client's view.  *Compare Int'l Adhesive Coating Co*., 851
F.2d at 545 ("Vesey testified that he derived his damage
estimates by reviewing International's business and financial
records and through interviews with company personnel.  We think
it obvious that these are sources of information normally and
reasonably relied upon by accountants.") *with Thorndike*, 266 F.
Supp. 2d at 185.  Because Zatarain's interpretation of third-
party files provides an independent basis for his opinion, I
will not exclude his testimony and will instead allow his
testimony to be tested through cross-examination.

**F.   *Copyright Issues***

     Iconics seeks to exclude Zatarain's testimony related to
copyright issues.  In part, it seeks to do so for reasons

related to the discovery dispute over remote access to BaxEnergy
customer servers.  I addressed and resolved these issues in the
June 27, 2016 order granting Iconics' motion to compel and for
sanctions and, in light of that order, I see no need for
exclusion here.  Iconics also seeks to prevent Zatarain from
testifying on whether the use of webHMI.js was fair use under
copyright law and whether it was "reasonable."  These arguments
do not go to the substance of Zatarain's expert report, but only
to the language that he uses.  Rather than categorically exclude
this testimony, which properly channeled could prove useful to
the jury given the likely importance of webHMI.js at trial, I
simply warn that any testimony which offers legal conclusions
along these lines is precluded and will be stricken in forceful
terms if offered in the presence of the jury.

### G.    *Misrepresentations of Record*

Finally, Iconics raises a host of challenges to Zatarain's
characterization of the record.  Calling these
mischaracterizations does not obscure the fact that they amount
to rival interpretations of relevant issues in this case, such
as the distinctions between Iconics' asserted trade secrets and
the implementation of those trade secrets, or minor quibbles
over word choice.  They do not establish that Zatarain's
methodology is unreliable and I will not exclude Zatarain's
testimony on these grounds.

*H.    Summary*

In conclusion, I will preclude Zatarain's testimony from his initial report concerning interoperability and the use of Microsoft software for workflow functions.  I will also preclude efforts to offer legal conclusions.  The remainder of Zatarain's expert testimony need not be excluded.

### III. BRADFORD KULLBERG

Bradford Kullberg is a damages expert for defendants. Kullberg produced his expert report on March 11, 2016 and then issued a supplemental report in light of the additional discovery on Iconics' trade secret claims on August 31, 2016, in which he made no changes to his initial report.  Iconics moved to exclude certain areas of his testimony in light of his initial report and renewed its motion to exclude in light of his supplemental report.

*A.    Reliance on Zatarain*

As a damages expert, Kullberg relies substantially on the technical opinions of defendants' expert Zatarain.  Iconics moves that insofar as Zatarain's testimony is excluded as unreliable, Kullberg's testimony should likewise be excluded as unreliable.  Although it is generally the case that "when an expert relies on the opinion of another, such reliance goes to the weight, not to the admissibility of the expert's opinion," *Ferrara & DiMercurio* v. *St. Paul Mercury Ins. Co.*, 240 F.3d 1, 9

(1st Cir. 2001), gatekeeper judges "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Ruiz-Troche* v. *Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). I have allowed much of Zatarain's testimony to be admitted as expert opinion and I therefore will not exclude Kullberg's testimony on these grounds.

Iconics also seeks to exclude portions of Kullberg's testimony based on information that was provided by Zatarain but was not included in Zatarain's expert report. Under the Federal Rules of Evidence, an expert is permitted to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Experts may rely on a wide range of information in constructing their opinions, including information gleaned from a fellow expert outside of his or her formal report. *Mass. Mut. Life Ins. Co.* v. *DB Structured Products, Inc.*, No. CIV.A. 11-30039-MGM, 2015 WL 2130060, at *7, *13, *15 (D. Mass. May 7, 2015) (finding an expert's testimony reliable even though it was based in part on "discussions with other experts he knows and with whom he worked"). As discussed above, the strength of the factual underpinning of an expert's opinion is a matter of weight and credibility. *Milward*, 639 F.3d at 22. I will permit Kullberg

to opine as to damages using assumptions based on information
provided by Zatarain.

**B.    *Opinions as to Liability***

Kullberg is a damages expert, and the parties agree he is
not qualified to opine on technical matters outside his
expertise.  Iconics argues that he strayed into opinions as to
liability at several points throughout his expert report.  A
review of the record indicates otherwise.  In the passages cited
by Iconics, Kullberg mentions the defendants' liability
arguments for the sole purpose of framing his damage
calculations.  In the first instance, Kullberg writes "I
understand that Mr. Zatarain has evaluated the alleged trade
secrets and concluded that they have been publicly disclosed . .
. ."  The second passage cited begins "Counsel for the
Defendants has also informed me . . . ."  Such fleeting,
introductory remarks do not constitute an opinion on liability
and will not be excluded unless the predicate to which they make
reference is not adequately established to present a jury issue.

**C.    *Opinions Regarding the OPC Foundation***

Iconics seeks to exclude certain opinions concerning
Iconics' participation in the OPC Foundation, a standard-setting
organization, and its effect on liability or damages.  In their
first motion, defendants claimed that these opinions were
"placeholders" included only temporarily due to pending

discovery disputes over this very issue.  Kullberg's
supplemental report, however, makes no changes to these
placeholder opinions, even in light of the additional discovery
on Iconics' trade secrets.  Kullberg indicated in his deposition
on March 24, 2016 that his opinions related to Iconics'
participation in the OPC Foundation necessarily relied on the
development of certain facts in discovery.  Without a further
discussion linking Iconics' participation in the OPC Foundation
to his speculative assertions in this section, Kullberg's
testimony regarding these issues will be excluded.  I have
afforded defendants the opportunity for development of the OPC
Foundation participation issue, but it appears nothing
meaningful has been uncovered.  Consequently, I will exclude
testimony regarding OPC participation.

**D.   *Opinions as to Legal Issues***

Iconics asserts that certain sections of Kullberg's expert
report improperly offer legal opinions.  First, Kullberg's
report makes several references to statutory copyright damages
under 17 U.S.C. § 504(c), which are not being sought in this
case.  Because Iconics does not seek these damages, I agree that
reference to them could prove misleading to the jury.  I will
therefore not permit Kullberg to opine as to statutory copyright
damages under § 504(c).  Second, Iconics lays out a smattering
of references to other legal issues throughout Kullberg's

report, but, like his so-called opinions on liability discussed
above, these fleeting statements are no more than assumptions,
often with direct citations to "discussions with counsel," that
introduce Kullberg's view on damages.  I will not exclude any of
these references again assuming that they merely introduce and
frame his own views or matters within his expertise.

**E.  *Methodology***

Iconics challenges two aspects of Kullberg's methodology as
unreliable: his apportionment of profits attributable to
infringement of intellectual property and his estimation of
royalty payments in connection with Project Foxtrot.  Put
simply, Kullberg apportions profits from the webHMI.js
infringement by assuming each customer contributed equally to
BaxEnergy's operating profit and that each line of code
contributes equally to the software's overall value.  He
apportions trade secret liability by comparing the number of
trade secrets still in the case to the 649 originally claimed by
Iconics.  In response, Iconics argues that some clients, some
lines of code, and some trade secrets are more important and
valuable than others and that it is an unsound methodology to
calculate damages otherwise.  *Comput. Assocs. Int'l, Inc.* v.
*Altai, Inc.*, 775 F. Supp. 544, 571-72 (E.D.N.Y. 1991) *aff'd in
part, vacated in part*, 982 F.2d 693 (2d Cir. 1992) ("The
significance or the value of the copied material is not

26

necessarily measured by counting lines of code; their qualitative value should also be taken into account."); *cf. Samsung Elec. Co., Ltd.,* v. *Apple Inc.*, 137 S. Ct. 429, 436 (2016) (under patent law, when evaluating jury award, courts must identify the infringing "article of manufacture," which can include "both a product sold to a consumer and a component of that product," and ensure that the damages are limited to the profits realized from the infringing "article of manufacture"). The First Circuit has held, however, that a statistical analysis which fails to take into account important distinctions in what is being analyzed may still be admissible, for the weakness of the statistical analysis can be viewed "as a matter of weight rather than admissibility." *Currier* v. *United Techs. Corp.*, 393 F.3d 246, 252 (1st Cir. 2004). Kullberg justified his apportionment methodology and applied it in a defensible and replicable way. The merits of that apportionment may be explored during cross-examination at the appropriate time.[4]

Kullberg's opinion concerning royalties that Project Foxtrot may have owed Iconics is not methodologically flawed.

---

[4] I have invited the parties to make further summary judgment submission to determine whether apportionable copyright damages are available on the record before. If I determine that they are not, of course, I will strike that damage theory and this aspect of Kullberg's testimony will be excluded. If I find the damage theory is viable, I will consider whether additional discovery, in service of a bifurcated trial proceeding on this aspect of damages, is necessary.

Kullberg opines that because the proportion of Iconics code in Project Foxtrot would decline over time, as the product was revised and improved, it would be reasonable for the amount of royalties it paid to decline as well.  Iconics argues instead that there is no reason to believe that the same absolute amount of code would be worth less in royalties over time.  This is an argument about Kullberg's conclusions and not his methodology. It is for the jury to decide.

**F.  *Opinions Unsupported by Sufficient Facts or Data***

Finally, Iconics criticizes parts of Kullberg's report as being unsupported by sufficient facts or data to demonstrate reliability.  These criticisms do not amount to grounds for exclusion here.  Some of the statements cited by Iconics are assumptions permissibly borrowed from other experts or from counsel, such as Kullberg's assumption, based on his reading of Zatarain's report, that Mr. Bax would have been aware of certain Iconics technologies.  Others are minor, one-off disputes, such as the proper cost of a license for a rival SCADA software.  If Iconics continues to dispute these statements, it may raise them at trial, but for now they are not issues sufficient, as a matter of *Daubert* gatekeeping, to cause me to foreclose his testimony.

28

## IV. CONCLUSION

For the reasons discussed in greater detail above with respect to [Dkt. No. 541], I exclude Pappas's testimony regarding the "unwitting investor" theory of damages, but will not exclude any of his other testimony at this time;

With respect to [Dkt. No. 538], I exclude Zatarain's testimony regarding interoperability, the use of Microsoft software for workflow functions, and his own legal conclusions, but will not exclude any of his other testimony; and

With respect to [Dkt.No. 546], I exclude Kullberg's testimony regarding statutory copyright damages and Iconics' participation in the OPC Foundation, but will not exclude any of his other testimony.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE