UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ICONICS, INC.                          )
                                       )
          Plaintiff,                   )
                                       )       CIVIL ACTION NO.
     v.                                )       11-11526-DPW
                                       )
SIMONE MASSARO,                        )
CHRISTOPHER VOLPE, VENTO               )
INDUSTRIES, INC., BAXENERGY GmbH       )
And BAXENERGY ITALIA S.r.L.,           )
                                       )
          Defendants.                  )

MEMORANDUM AND ORDER
July 19, 2017

Defendants Simone Massaro, BaxEnergy GmbH, Christopher

Volpe, BaxEnergy Italia, and Vento Industries have moved [Dkt.

No. 543] for summary judgment as to plaintiff Iconics' trade

secret misappropriation claims.[1]

Iconics alleges that defendants misappropriated its trade

secrets in developing the Energy Studio Pro product.  To

establish misappropriation of trade secrets under Massachusetts

law, a plaintiff must show "1) the information is a trade

_____

[1] I denied Iconics' motion for summary judgment and defendants'
motion for summary judgment as to other claims by Iconics in my
June 27, 2016 Memorandum and Order, but I reserved judgment on
the trade secret claims as I awaited further specifications of
the disputed secrets. *Iconics, Inc.* v. *Massaro*, 192
F. Supp. 3d 254, 262 (D. Mass. 2016).  The relevant facts and
procedural history of this case are set forth in that Memorandum
and Order.  *Id.* at 259-62.

secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc.* v. *Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007); *see also J.T. Healy & Son, Inc.* v. *James A. Murphy & Son, Inc.*, 260 N.E.2d 723, 730-32 (Mass. 1970).[2]  For the core first element, Massachusetts defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *J.T. Healy & Son, Inc.*, 260 N.E.2d at 729 (citing Restatement (First) of Torts § 757, comment b).  But, as the name suggests, a trade secret must be a secret; "[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *Id.*

There are three asserted trade secrets remaining at issue in this case; these relate to the core architecture, data intake, and workflow.  In their motion for summary judgment,

---

[2] Massachusetts has both a statute and a common law tort concerning misappropriation of trade secrets, but the liability analysis for both claims is "effectively the same." *Bruno Int'l Ltd.* v. *Vicor Corp.*, No. CV 14-10037-DPW, 2015 WL 5447652, at *11 (D. Mass. Sept. 16, 2015) (citing *Incase Inc.*, 488 F.3d at 52 n.10 and *Protégé Software Servs., Inc*. v. *Colameta*, 30 Mass. L. Rptr. 127, 2012 WL 3030268, at *11 n.25 (Mass. Super. Ct. July 16, 2012)).  Iconics does not press separate analyses and appears to rely on the common law tort.

defendants open two lines of attack.  First, they argue that they did not misappropriate Iconics' asserted trade secrets. Second, defendants argue that the asserted subjects are not in fact trade secrets, either because Iconics publicly disclosed them or because they involve the sort of public or general knowledge beyond trade secret protection.

I consider the arguments concerning each of the asserted trade secrets in turn.

## I. CORE ARCHITECTURE

Iconics' first asserted trade secret concerns its core architecture.  In its Narrative Description of asserted trade secrets, Iconics defines the core architecture trade secret as "the presence and arrangement of" several specified components, "the functionality of those components, and how they interact with and relate to one another."  The narrative description provides a graphic representation of how Iconics implements the core architecture trade secret and lists the eight components that are a part of the implementation.  Iconics explains how its core architecture "has been developed over a number of years" and therefore "reflects innumerable small tradeoffs and optimizations."  According to Iconics, the core architecture trade secret would be particularly useful to a software developer in the early stages of development, because the new

developer could utilize these benefits without having to invest the time and energy it took Iconics to realize them.

## A.   *Misappropriation*

Iconics does not dispute that its core architecture trade secret was publicly disclosed on April 9, 2009, when an earlier Iconics patent application was published. *Atl. Research Mktg. Sys., Inc.* v. *Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011) (applying Massachusetts law and concluding "[t]hat which is disclosed in a patent cannot be a trade secret"). Iconics claims, however, that Massaro misappropriated the core architecture trade secret during the brief window of time between his departure from Iconics in January 2009 and the public disclosure on April 9, 2009.

Defendants argue that Iconics has presented no direct evidence that Massaro worked on any code employing the core architecture trade secret before April 9, 2009. They note that the earliest code potentially relevant to the asserted trade secret was not checked in until February 2010. Responding to Iconics' claim that Massaro's company AnteaSoft may have written some code incorporating three of the eight components of the core architecture before April 2009, defendants assert that use of three components would not qualify as misappropriation of the trade secret. Defendants contend the core architecture trade secret must be viewed as all eight components and their

4

interrelations.  *See American Airlines, Inc.* v. *KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111-12 (8th Cir. 1997) (expert's testimony that "the specific combination of all five elements constituted a trade secret" meant combination of fewer than five elements would not constitute the trade secret).

In response, Iconics adduces evidence it contends indicates that the full core architecture was misappropriated between January 2009 and April 9, 2009.  It points to several communications between Massaro and Mr. Bax in February 2009 regarding software Massaro was developing for Bax Wind Power, including one email where Massaro stated he was working on the "architectural overview" of the software.  Iconics also explains that it cannot identify any relevant code developed before February 2010 because defendants have failed to turn over any code or early design documents from that time period.  Finally, setting aside the question whether defendants misappropriated before April, 9, 2009, Iconics' expert Christian Hicks opines that BaxEnergy employs the core architecture trade secret in Energy Studio Pro, basing his conclusion on both BaxEnergy's source code and its technical design.  In their initial motion for summary judgment, defendants by contrast cite the report of their expert Arthur Zatarain, who concludes that BaxEnergy does not employ the core architecture trade secret.

Drawing all inferences in Iconics' favor, a reasonable jury could find that defendants misappropriated the core architecture trade secret before April 9, 2009.  Even if Iconics lacks direct evidence in the source code showing misappropriation, a jury could reasonably rely on the February 2009 communications to support the view that Massaro had employed the core architecture trade secret to structure the new software he was developing for Bax Wind Power before April 9, 2009.  *Data Gen. Corp.* v. *Grumman Sys. Support Corp.*, 825 F. Supp. 340, 358-59 (D. Mass. 1993), *aff'd in relevant part*, 36 F.3d 1147 (1st Cir. 1994) (jury permitted to find trade secret misappropriation even if plaintiff failed to identify the source code embodying the alleged trade secret).[3]  That evidence, coupled with the Hicks expert report, is sufficient to defeat defendants' motion for summary judgment on this claim.  The competing interpretations of BaxEnergy's architecture arrangements between Hicks and Zatarain, as well as the rivaling views of the February 2009 communications, must be resolved by the jury at trial.

**B.   *Public Knowledge and Disclosure***

Defendants reference two sets of materials that they assert disclose the core architecture trade secret.  The first set

---

[3] This is particularly true here, since Iconics claims that the source code would show only the implementation of the core architecture trade secret, not the trade secret itself.

comes from a 2008 presentation Iconics demonstrated at a customer event and includes diagrams of the Genesis64 architecture.  Defendants assert that this presentation discloses six or seven of the components in the core architecture trade secret, as well as their relationships.  The second set comes from an April 2008 release of Genesis 32 version 9.1, which has manuals and presentations that defendants claim disclose every component of Iconics' system.  Although defendants concede that Iconics expert has raised two or three distinctions between these 2008 materials and a diagram showing the implementation of the core architecture trade secret, they argue that these 2008 materials collectively disclose the core architecture trade secret.

Iconics responds that its expert Hicks testified at his deposition that none of these 2008 materials disclose the core architecture trade secret and further notes that defendants fail to explain how these documents disclose the core architecture trade secret. Iconics asserts that even assuming these documents disclose aspects of the core architecture trade secret individually, defendants do not explain how these documents could logically be combined to arrive at the complete core architecture trade secret. *Sutra, Inc. v. Iceland Exp.*, No. CIV.A. 04-11360-DPW, 2008 WL 2705580, at *4 (D. Mass. July 10, 2008) ("'A trade secret can exist in a combination of

characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.'") (quoting *Integrated Cash Mgmt. Servs.* v. *Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990)). In their reply brief, defendants provide no further explanation of how the 2008 diagrams in combination disclose the full core architecture and instead retreat to the conclusory assertion that "the pictures don't lie."

Drawing all inferences in Iconics' favor, a reasonable jury could find that the assorted 2008 documents do not disclose the core architecture trade secret. In his deposition, Hicks explained how the 2008 materials do not contain sufficient technical information to disclose the core architecture trade secret and also noted that the diagrams in these materials at times conflict with each other. Such reliable and grounded expert opinion distinguishing customer-oriented mass-market materials from the full technical details of the core architecture trade secret is sufficient by itself to raise a genuine dispute of material fact to defeat summary judgment.[4]

---

[4] The Second Circuit, when presented with a substantially similar issue, found that a "user-oriented description" of a software product did not disclose the software's architecture because "[t]he defendants have not shown that the limited information available in the promotional literature contains sufficient technical detail to constitute disclosure of the product's

Based on defendants' failure to explain adequately how the documents can be read together, a reasonable jury could independently find that the 2008 documents disclose only aspects of the core architecture and not the full core architecture trade secret. *Sutra, Inc.*, 2008 WL 2705580, at *4.

I therefore deny defendants' motion for summary judgment as to the core architecture trade secret.

## II. DATA INTAKE

Iconics' second asserted trade secret concerns data intake. Iconics defines the data intake trade secret in its narrative to be, in its simplest form, "a single component for unifying various operations between a client application and an application server for various types of local and remote data sources." Iconics further specifies both the functions that the component handles and the types of data sources covered by the trade secret. The component unifies "the requesting, releasing, receiving updates, and writing values for" five identified data sources: constant values, local aliases, local simulation, local expressions, and remote OPC UA data.

---

architecture." *Integrated Cash Mgmt. Servs., Inc.*, 920 F.2d at 173-74. The court, citing expert testimony in the record, credited a finding that the "specifications used by ICM to make the parts of that package work together" were not in the public domain. *Id.*

In an effort to explain its data intake secret in layman's terms, Iconics analogizes the design of data intake systems to the design of a home theater system.  A home theater system could be structured so that the various entertainment sources, such as a DVD player, a satellite television feed, or a video game console, are all connected directly to the television. Under this design, a consumer would have to operate three separate remotes, one for each entertainment source. Alternatively, a home theater system could be structured so that the entertainment sources connect to a central receiver, which in turn passes the audio and video signals to the television. Under this alternative design, a consumer could use a single universal remote device to control all three entertainment sources.  Such a design would be the simplest for the consumer, but would require the system designer to create a component capable of receiving not only data from all three entertainment sources, but also input from the universal remote related to all three entertainment sources.

Iconics claims its data intake secret acts like the central receiver in the second home theater system design.  It explains that Iconics' DataClient, which is an implementation of its data intake trade secret, allows a user to access and perform operations on simulated data, OPC UA data, or the other types of data sources asserted in the trade secret through the same

10

single component, just as the central receiver allows the
television viewer to access and perform operations on the data
from the DVD player, the satellite feed, or the video game
console.  Iconics asserts that the primary benefit of its data
intake secret is that it allows clients to customize the system
to fit their individual needs.

**A.    *Specificity of the Alleged Trade Secret***

As a threshold matter, defendants seem to argue that
Iconics has failed to define its data intake trade secret with
adequate specificity.[5]  "'A plaintiff has no cognizable trade
secret claim until it has adequately identified the specific
trade secrets that are at issue.'" *Sutra*, 2008 WL 2705580, at *4
(quoting *Cambridge Internet Solutions* v. *Avicon Grp.*, No.99-
1841, 1999 WL 959673, at *2 (Mass. Super. Ct. Sept. 21, 1999).
Although it can be "understandably difficult when describing
complex scientific concepts" to speak both clearly and with
particularity, *Alnylam Pharm., Inc.* v. *Dicerna Pharm., Inc.*, No.
MICV20154126, 2016 WL 4063565, at *3 (Mass. Super. Ct. Apr. 6,
2016), a court should not have to "sift through technical data
to distill out a trade secret." *TouchPoint Solutions, Inc.* v.

---

[5] Defendants raise this argument only obliquely and when they do,
it is for the most in regard to Iconics' entire trade secret
claim rather than the data intake secret claim in particular. I
will, nevertheless, discuss specificity specifically in the
context of the alleged data intake trade secret.

*Eastman Kodak Co.*, 345 F. Supp. 2d 23, 28 (D. Mass. 2004).
"[T]he plaintiff must be clear about what information is
protectable." *Id.*

Defendants argue that Iconics has altered its definition of
the data intake trade secret throughout this litigation.
Defendants claim that Iconics initially defined the data intake
trade secret as a client-side component that unifies operations,
similar to the definition Iconics posits in the narrative. But,
defendants assert, after some discovery Iconics redefined its
data intake trade secret as a server-side component in order to
have the trade secret cover other elements of BaxEnergy's
system. Finally, defendants claim that Iconics attempted to
return to its client-side component definition after published
patent applications revealed these server components to be
publicly disclosed.

Discovery disputes such as this demonstrate why "[p]recise
identification of the alleged trade secrets is a crucial
component of trade secret litigation." Charles Tait Graves and
Brian D. Range, *Identification of Trade Secret Claims in
Litigation: Solutions for a Ubiquitous Dispute*, 5 Nw. J. Tech. &
Intell. Prop. 68, 68-69 (2006). Otherwise, a trade secret
litigation plaintiff may "alter its list of trade secret claims
as the case proceeds," leaving defendants "spend[ing] months

disproving one set of allegations only to face a new, replacement set as the close of discovery nears." *Id.*

Defendants are correct that Iconics has failed at times in this case to explain with precision what exactly the data intake trade secret does and how it could be identified in either Iconics' products or BaxEnergy's Energy Studio Pro.  However, Iconics' narrative description, provided in response to my June 27, 2016 order, *Iconics, Inc.*, 192 F. Supp. 3d at 262, sufficiently addresses these concerns, defining the data intake trade secret both with technical specificity and "with clarity that can be understood by a lay person." *Staffbridge, Inc.* v. *Gary D. Nelson Assoc., Inc.*, No. 024912BLS, 2004 WL 1429935, at *4 (Mass. Super. Ct. June 11, 2004).  Despite any earlier difficulties, I find Iconics has now described its alleged data intake trade secret with enough particularity for a reasonable jury to identify whether it has a valid trade secret of this kind.

## B.   *Misappropriation*

Defendants argue that they did not misappropriate the data intake trade secret, differentiating Energy Studio Pro's design from the trade secret in two ways.  First, defendants claim the client-side component of Energy Studio Pro handles only a single type of data, whereas the data intake trade secret unifies operations on multiple types of data.  Second, they claim Energy

Studio Pro uses two separate components, one server-side component and one client-side, whereas the data intake trade secret uses a single component.  In response, Iconics asserts that BaxEnergy's client-side component, OPCDataClient, does in fact unify data from the types of local and remote data sources covered by the trade secret.  Iconics explains that even though the data coming into OPCDataClient is expressed as a single data type, this single data type represents information from various sources.  Finally, Iconics points to the supplemental Hicks report, where after analyzing the code of Iconics' DataClient and BaxEnergy's OPCDataClient, he concludes that the OPCDataClient employs the data intake trade secret.

Once again, drawing all inferences in Iconics' favor, a reasonable jury could find that defendants misappropriated the data intake trade secret.  Based on the definition in the narrative description, the key functionality of the data intake trade secret is the unifying of operations into a single component for various types of "data *sources*." (emphasis added).  Even if, in Energy Studio Pro's system, a separate server-side component first translates the data arriving from the various sources covered by the trade secret into a single data type, a reasonable jury still could find that the OPCDataClient unifies operations on that data into a single component.  That distinction, along with the well-grounded conclusions of the

14

Hicks report, is sufficient to preclude summary judgment on this claim.

## C.   *Public Knowledge and Disclosure*

Defendants point to a wide range of materials that they claim either publicly disclose the data intake trade secret or render the data intake trade secret public or general knowledge within their industry.  *J.T. Healy & Son, Inc.*, 260 N.E.2d at 729.  Defendants first claim that the standardization efforts of the group Windows for Science, Engineering, and Manufacturing (WinSEM) disclose the data intake trade secret.  Defendants admit, and Iconics emphasizes, that the WinSEM standards do not address the types of data sources outlined in the trade secret. But, defendants argue that because the WinSEM standards allow for customization as to data types, they could be capable of implementing the types of data sources in the trade secret.

Defendants' argument is without merit.  The fact that industry standards would allow a user to arrive at the trade secret does not mean that the trade secret is disclosed, for as previously discussed, a trade secret can be based in elements "'each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.'"  *Sutra, Inc.*, 2008 WL 2705580, at *4 (quoting *Integrated Cash Mgmt. Servs.* 920 F.2d at 174).  Because

defendants merely speculate as to whether any other WinSEM user came upon Iconics' "unique combination," I deny summary judgment as to the WinSEM disclosures.

Similarly, defendants argue that a different industry standard makes the data intake trade secret general knowledge. The OPC Foundation, which sets standards in the automation industry, has a component called the OPC Client that defendants claim has the same functions as the data intake trade secret. Defendants compare the three modules of the standard OPC Client to the implementation of the data intake trade secret in Iconics' Data Client component and conclude that Data Client has the same structure and allows for the same operations to be performed.  Iconics responds that defendants did not show any implementation of the standard OPC Client that supports the various types of data sources in the trade secret.  Iconics also asserts that the standard OPC Client cited by defendants shows a component that interacts with only a single data source, rather than the multiple types of data sources covered by the data intake trade secret.  Finally, Iconics notes that its system already contains a standard OPC Client, called DataWorX, separate from its Data Client and that it would be redundant for the system to have DataWorX and Data Client if they performed the same function.

As with the defendants' WinSEM disclosure argument, the OPC standard argument is unavailing. The types of data sources described in the data intake trade secret are an essential part of the trade secret. In *Atlantic Wool Combing Co.* v. *Norfolk Mills, Inc.*, after the district court concluded that the plaintiff's device could not receive trade secret protection because "(1) its essential mechanical concepts were already embodied in another well-known machine that performed a not very different function, and (2) the adaption of that familiar machine . . . [was] a relatively simple undertaking for a competent technician," the First Circuit reversed. 357 F.2d 866, 868 (1st Cir. 1966). The First Circuit stated that "[w]hat some other skilled person could or might have done is not controlling" in a trade secret case "so long as the plaintiff did in fact design for its own exclusive use and withheld from general knowledge a new and different machine." *Id.* at 869. The improved design of the plaintiff's new machine embodied the "[c]ommercially valuable special knowledge which the plaintiff developed through the exercise of skill and ingenuity, through experimentation and through the expenditure of money and effort over a period of time." *Id.*

Here, read in a light most favorable to Iconics, a reasonable jury could conclude that Iconics' Data Client, which has the ability to interact with multiple specific types of data

17

sources rather than a single data source, constitutes a "new and different machine" from the standard OPC Client and that Iconics sought to withhold this design from general knowledge. *Atl. Wool Combing Co.*, 357 F. 2d at 869; *see also Diomed, Inc.* v. *Vascular Sol., Inc.*, 417 F. Supp. 2d 137, 144 n.5 (D. Mass. 2006) ("[T]he standards of novelty or invention required for patentability are *higher* than the standard of secrecy required for trade secret.") (emphasis in original). Moreover, a reasonable jury could conclude that the presence of DataWorX in Iconics' system further indicates that Data Client performs additional functions beyond a standard OPC Client and that those additional functions reflect the investment of time and resources Iconics put into developing and honing its system. *Atl. Wool Combing Co.*, 357 F. 2d at 869. I therefore deny summary judgment as to the OPC Client disclosure.

Defendants next claim two Iconics programs disclose the data intake trade secret. Defendants assert that a programming interface within Iconics DataWorX application, titled AutoDwxRuntimeLib, is a public disclosure of the data intake trade secret because AutoDwxRuntimeLib is a single component that unifies the same operations listed in the trade secret. In response, Iconics points to deposition testimony by Hicks, where he maintained that AutoDwxRuntimeLib does not disclose the data intake trade secret because it does not provide data to a user

or client application.[6]  Iconics also attempts to distinguish the
operations available in AutoDwxRuntimeLib and the data intake
trade secret.  Defendants argue that nothing in Iconics'
original pleading of the data intake trade secret mentions that
the secret must involve providing data to a user or client
application.  Defendants may be correct as to some earlier
definition of the data intake trade secret.  Under the narrative
description, the clarified statement of Iconics' trade secrets
that now governs this case, however, the simple definition of
the data intake secret is "a single component for unifying
various operations between *a client application* and an
application server for various types of local and remote data
sources."  (emphasis added).  Drawing all inferences in Iconics'
favor, a reasonable jury could find that the data intake trade
secret necessarily involves a client or user application and
could therefore conclude that AutoDwxRuntimeLib does not
disclose the data intake trade secret.

     Finally, defendants claim that Iconics' product ActiveX
ToolWorX publicly discloses the data intake trade secret.
ActiveX ToolWorX allows users to create custom animated
graphics, link the animation to data, and use that animation in

---

[6] Hicks testified that AutoDwxRuntimeLib discloses "how to create
a piece of software to help configure a DataWorX server as
opposed to a user application for actually observing and
displaying data to users."

a client application, which defendants argue matches the
functionality of the data intake trade secret.  Iconics responds
that ActiveX ToolWorX is not capable of performing some of the
operations identified in the trade secret, explaining how a user
could not "release" data sources using ActiveX ToolWorX.
Iconics also points to testimony from its chief software
architect distinguishing between ActiveX ToolWorX and the data
intake trade secret.  In their reply brief, defendants claim
that some parts of ActiveX ToolWorX manual indicate that it can
in fact "release" data sources, but they also note that Hicks
would not concede that ActiveX ToolWorX had the capability to
perform a release operation.

There remains a genuine dispute of material fact over the
operational capabilities of ActiveX ToolWorX.  *Reyes-Orta* v.
*Puerto Rico Highway and Transp. Authority*, 811 F.3d 67, 73 (1st
Cir. 2016) ("A 'genuine' dispute exists when a jury can
reasonably interpret the evidence in the nonmovant's favor.").
If ActiveX ToolWorX cannot perform one of the key functions
identified in the data intake trade secret, it cannot disclose
the trade secret.  *Atl. Wool Combing Co.*, 357 F. 2d at 869.
Reading the evidence in the light most favorable to Iconics, a
reasonable jury could rely on Iconics' chief software architect
and the views of Hicks to conclude that ActiveX ToolWorX is

20

unable to release data and therefore does not disclose the data intake trade secret.

For all the reasons discussed above, I will deny summary judgment as to the data intake trade secret claims.

### III. WORKFLOW

Iconics' third asserted trade secret concerns workflow.  In its narrative description, Iconics explains that a workflow is a series of actions that takes place in response to an event, such as an alarm sounding in response to a sudden failure of a wind turbine.  The workflow trade secret does not cover the response itself, but instead encompasses the process "by which workflows are automatically initiated."  For the workflow trade secret, that automatic process involves:

> the capability to dynamically provide **key process information** as parameters to the transaction at transaction invocation time by utilizing **event information**, which **triggers** the specific transaction, to provide specific parameters to the transaction and directly influence the transaction's workflow, **accomplished via dedicated data schema, dedicated event modeling and event propagation techniques**. (emphasis in original).

Iconics identifies the bolded text as the "key elements" of the trade secret.  Using the workflow trade secret, a system can determine when a triggering event occurs, what workflows should respond to the event, and what information about the event should be sent to the necessary workflows.  After defining the workflow trade secret, Iconics separately lists the benefits of

the secret.  In that section, Iconics notes that one of its primary benefits is its modularity, which allows for greater customization of systems using the workflow trade secret.

## A.   *Misappropriation*

Defendants' misappropriation argument appears to be that the workflow trade secret necessarily requires a multi-component modular workflow system, while BaxEnergy's system uses only a single component.  According to defendants, if Iconics' workflow trade secret is broad enough to include both multi-component and single component systems, then Iconics claims a monopoly over all workflow design.  Iconics responds that the narrative definition of the workflow trade secret does not require modularity; the narrative mentions modularity only as a benefit of the workflow trade secret.  Iconics goes on to argue that defendants' system is in fact a multi-component modular system. In their reply brief, defendants claim, without citation to case law, that if a system's design does not realize the benefits of a design protected as a trade secret, then as a matter of law the system must be materially different from the trade secret.[7]

It may be that, read in a light most favorable to Iconics, a reasonable jury could find that defendants' workflow implementation is a multi-component modular system.  But such a

---

[7] For its part, Iconics states that it is not aware of any case law supporting this method of defining trade secrets.

conclusion puts the cart before the horse, because defendants
seek to invert the proper trade secret analysis.  To return to
basic definitions, a trade secret is "any formula, pattern,
device or compilation of information which is used in one's
business, and which gives him an opportunity to obtain an
advantage over competitors who do not know or use it."  *J.T.
Healy & Son, Inc.*, 260 N.E.2d at 729.  The advantage obtained
need not be substantial; "any advantage, however small or
ephemeral, is sufficient" to create a trade secret. *Advanced
Micro Devices, Inc.* v. *Feldstein*, No. CV 13-40007-TSH, 2013 WL
10944934, at *8 (D. Mass. May 15, 2013).  If a misappropriator
uses a trade secret even to some small benefit, but fails to
implement it in a way that maximizes its value, it has still
misappropriated the secret.

Drawing all inferences in Iconics' favor, a reasonable jury
could find that defendants used the workflow trade secret to
create its workflow system, but failed to implement the secret
in a way that realized one of its benefits.  Even if a jury were
to credit defendants' argument that its system is not modular,
it could still conclude that defendants' workflow system is
simply an inferior implementation of Iconics' workflow trade
secret.  Such a conclusion would have additional support in the
first Hicks report, where he asserts that BaxEnergy's system
employs features from the workflow trade secret that serve no

purpose in BaxEnergy's system.  Although the dispute over
whether defendants employ a multiple-component or single
component system is likely sufficient to preclude summary
judgment, I find summary judgment equally inappropriate because
a reasonable jury could find that defendants misappropriated the
workflow trade secret but implemented it in an imperfect manner.

**B.    *Public Knowledge and Disclosure***

Defendants raise two reasons why the workflow trade secret
is either public knowledge or has been publicly disclosed.  The
first is based upon defendants' attempted redefinition of the
workflow trade secret to require modularity.  This argument is
unresponsive to Iconics' actual definition of the workflow trade
secret, which mentions modularity only as a benefit of the trade
secret, and I will not grant summary judgment on this ground.
As to the second, defendants argue that Iconics claims a trade
secret over all queues in software.  Iconics responds that its
workflow trade secret is far narrower and covers only event
propagation techniques that involve interactions between a
trigger thread, trigger runtime, workflow/transaction manager,
and a central communication queue.  I find that Iconics has
presented a more specific definition of its workflow trade

secret than defendants hypothesize and I find no basis to grant

defendants' motion for summary judgment on such grounds.[8]

### IV. CONCLUSION

For the reasons discussed in greater detail above, I deny

defendants' motion [Dkt. No. 543] for summary judgment as to

Iconics' trade secret misappropriation claims.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT

---

[8] Because defendants' invocation of the *Jet Spray* analysis is
based on these inaccurate definitions of Iconics' workflow trade
secret, I do not find defendants' reliance on that analysis
compelling.